### In Re OLSON'S ESTATE.

LARSON et al, Appellants, v. NELSON, Respondent.

(223 N. W. 41.)

(File No. 6340. Opinion filed January 5, 1929.)

*McNulty, Williamson & Smith,* of Aberdeen, for Appellants.
*Van Slyke & Agor,* of Aberdeen, for Respondent.

BROWN, J. Appellants are next of kin to Halleck Olson, deceased, and are contestants of an instrument offered for probate as his will, while respondent is proponent of the will for probate and is executor and one of the principal beneficiaries under the will. The county court admitted the will to probate and on appeal to the circuit court a trial was had before a jury, which returned a verdict in favor of the validity of the will. The court treated the verdict as advisory and made findings and conclusions supporting the will, and, from a judgment entered on such findings and conclusions and an order denying a new trial, the contestants appeal.

On the trial numerous objections were made by the attorneys on either side. Respondent's objections, exceeding 120 in number, were all sustained but one; appellants' objections, numbering about 30 in the aggregate, were all overruled. This does not necessarily indicate error on the part of the court in any of its rulings, but an examination of the record discloses that the learned trial court sustained many objections to, and excluded, evidence offered by appellant, and invariably overruled similar objections to, and admitted, evidence of the same kind when offered on behalf of respondent.

The will was dated January 7, 1924, and was signed by the testator and attesting witnesses on January 11. On July 8, 1924, a petition was filed in the county court asking for the appointment of respondent herein as guardian of the person and estate of Olson, on the ground that by reason of old age, poor health, and loss and failure of mental capacity, he was incapable of protecting and looking after his property, and after a hearing had on due and proper notice, the county court found that Olson was, by reason of old age, poor health, and loss and failure of mental capacity, incapable of looking after his property, and by an order dated July 17, 1924, appointed respondent as guardian of Olson's person and estate. Respondent as principal, with Fidelity & Casualty Company of Baltimore as surety, had, on July 12, 1924 executed

a bond as such guardian, from which it appears that he anticipated 5 days before the hearing that Olson would be found incompetent and that he himself would be appointed guardian. Olson died on December 24, 1925. There is no evidence that his mental capacity was greater when the will was signed than when respondent was appointed guardian because of his failure of mental capacity.

A. O. Krogh, one of the witnesses to the will, had known the testator for 20 years, and on direct examination said that he was of sound mind always. On cross-examination, he said that he last saw Olson about 9 months or a year before his death. That was necessarily some months after the guardian had been appointed for him. He was then asked if Olson's condition was the same when he last saw him as when he signed the will. An objection that this was not proper cross-examination was sustained. It was clearly proper cross-examination for a witness who had testified that deceased was of sound mind at the time he made the will to be asked if his condition when he signed the will was the same as his condition when the witness saw him at a time when he was under guardianship because mentally incompetent. A number of other questions along the same line were erroneously excluded.

After asking a number of questions tending to elicit that deceased, at and about the time of the execution of the will, was unable to tell the directions of one place from another in Aberdeen, with which he had been familiar for many years, all of which were excluded, plaintiff offered to show that the witness frequently had to direct the deceased to places in Aberdeen that had been familiar to him in the past. This was also excluded on the objection of defendant.

The deceased was a Swede and spoke a mixed Swedish and Norwegian dialect, but could not read, write, nor speak English. The witnesses say that he could say a few words in English, enough to get by, but that was all. The only testimony as to his knowledge of the contents of the will was given by respondent. Respondent testified that deceased at different times had said to him that he wanted to make a will, and that respondent told him to go and see a lawyer. The testimony shows that the will was drawn by a lawyer, but there is no evidence showing how deceased communicated to the lawyer what he desired the will to contain. It does not appear that the lawyer knew the Scandinavian dialect spoken

by deceased, nor that deceased ever had any written memoranda to give to a lawyer, at all corresponding with the terms of the will. There is evidence that he had a written memorandum a few days before he went to the lawyer's office, on which were the names of some of the persons mentioned in the will, with sums opposite the names, corresponding to the specific legacies mentioned in the will as to some of those persons. But this memorandum, according to the testimony, showed the sum of $500 opposite respondent's name, while the will gave respondent one-half of the residuary estate, which one-half would amount to something in the neighborhood of $10,000. Respondent testified that he first saw the will when deceased brought it to his office (he was then clerk of courts in Brown county); that he was then upstairs and one of the girl clerks called him, and when he came down deceased gave him the envelope containing the will and asked him to read it for him; that he took the will out of the envelope and read it all through just as it was, and that deceased asked him questions as he proceeded with the reading; that when they got through reading he asked him why he had not given Amanda Bunsness anything, and deceased replied that his wife had provided for two of Amanda's children by leaving a quarter section of land which she owned to them, those children being nephews of Peter Bunsness, the legatee of the other one-half of deceased's residuary estate. As the will was in English, which could not be understood by deceased, respondent necessarily interpreted its provisions to deceased into the Scandinavian dialect. Two girl clerks who were present while the reading was done testified that from the length of time occupied they were satisfied that respondent read the entire will, but neither of them saw any of its provisions and neither of them knew anything of the Scandinavian dialect, and were therefore unable to say whether the contents of the will were known to deceased or not. Respondent had not been to visit deceased in 15 years and never had any occasion to help him except when he would come up to the office at such times as he wanted information with regard to the rents from his farm or his taxes, when he would come to respondent who would inform him in regard to those things.

On cross-examination, he was asked how many times decedent had been to his office in the 3 years preceding the execution of the

will, to which an objection that it was not proper cross-examination was sustained. About 3 weeks before the will was signed deceased came to respondent's office with Erickson and talked about having a will drawn, on which occasion respondent testified that deceased desired him to draw the will, but he told him to go and see a lawyer about it; that deceased said that respondent would be mentioned in the will, and thereupon respondent told him that he would not have anything to do with it then, that he must go and see a lawyer. On cross-examination, respondent was asked if Mr. Erickson stayed with them while this conversation went on, and this was excluded as not proper cross-examination. Respondent was cross-examined and answered quite fully in regard to whether he directed deceased to go to the lawyer who drew the will, and how deceased happened to go to that lawyer, whether respondent had anything to do with suggesting the terms of the will, to all of which he answered in the negative. As a part of plaintiff's case his attorney called respondent for examination as an adverse witness, to which respondent's counsel objected on the ground that a will contest is not a proceeding in which an adverse party may be called for cross-examination, which objection was sustained, the court ruling that no question could be asked respondent as an adverse witness or adverse party, to which ruling plaintiff excepted. Respondent on this appeal argues that even if it should be held that he might be called for examination as an adverse party, yet plaintiff was not prejudiced by the court's ruling because respondent had been cross-examined while on the stand as a witness on his own behalf in support of the will. It will be observed that this was not stated as a ground of objection to calling him for examination as an adverse witness, the sole ground urged being that a party to a will contest could not be called for examination as an adverse witness, and the objection was sustained on that ground only. It has also been seen that, while respondent was examined at some length in regard to his knowledge of the circumstances attending the drafting and signing of the will, objections to questions more or less remotely bearing on the subject were excluded as not proper cross-examination.

Rev. Code, § 2714, provides that "A party to the record of any civil action or proceeding" may be examined as a witness at the instance of the adverse party as if under cross-examination,

and the party calling him shall not be bound by his testimony and may rebut the testimony given by him. It is clear that a will contest is a proceeding, and respondent, being a party to the record, was subject to be called and examined as an adverse witness, and it was error to sustain the objection made.

In First State Bank of Wood v. Anderson, 46 S. D. 104, 191 N. W. 339, it was held that plaintiff's officers having been fully examined and cross-examined as witnesses for plaintiff, it was not prejudicial error for the court to refuse to allow such officers to be called for examination as adverse witnesses, there being nothing to indicate that the examination would be other than a repetition of the cross-examination already in the record, but we cannot say that that situation exists here. Respondent was the only witness who gave any testimony indicating that deceased, who knew practically nothing of the language in which the will was drawn, had any knowledge of the contents of the will. Respondent had a large financial interest in sustaining the will. Contestants are relatives of the deceased who had been on good terms with him and had visited him on friendly terms much more frequently than the residuary legatees. One of them, his nephew, lived in Minneapolis, and decedent went to Minneapolis at different times and usually stayed with this nephew while in the city. He testified that the deceased last visited there between 3 and 4 years prior to his death, at which time he was in a hospital in Minneapolis and stayed with him 3 or 4 days after coming out of the hospital; that while there on this last occasion he talked frequently about making a will and made three attempts at drawing a will; that he wrote them out on sheets of common tablet paper without ending or signature, but simply mentioned different parties as beneficiaries; that he would leave these scraps of paper lying on the floor of his bedroom; that he did not pay anything for staying with this nephew; that he just came and was entertained there as a matter of friendship; and that they were on friendly terms all the time. On one occasion Olson, while at his home in Stratford, in Brown county, thought he was getting the influenza and wired his nephew to come out and see him. The nephew at once got on the train and came out, found that he was not sick, stayed a day and visited with him, and returned home. This nephew also testified that Olson was a man who could never do anything for himself; that they had to watch

him all the time when he went out of the house; that if he got a block away he would not know how to get back. This witness was then asked, from what he had seen and known of decedent's conduct and actions, what he would say as to his mental capacity, and whether or not his mind was immature and childlike, but on objection the question was excluded.

Another of the contestants, also a nephew, testified that 19 years previous he had worked for decedent during two summers; that decedent's wife always paid his wages and looked after all the business affairs, paid the threshing bills and taxes, and that all other business affairs were handled by her; that Olson did such work around the place as fixing fence, taking care of hogs and cows, helping with the milking and such like work, but that his wife managed the place; that Olson just did chores and things of that kind.

Another witness, also a nephew, testified that deceased visited with him the fall before he died, at his farm which was about 17 miles from Olson's own farm; that Olson then spoke about wanting to move down to this nephew's place if he were able, and that he was with Olson the day before he died. Questions asked of this witness as to Olson's mentality were objected to and sustained, and an offer to prove by this witness who had associated with him to some extent through many years that Olson was never fully mentally developed and at or about the time of the signing of this will was incompetent to make a will was objected to on the ground that no foundation had been shown upon which this witness might predicate an opinion as to decedent's mental condition. The objection was sustained and the offer excluded. There was evidence that Olson wanted to make a partial will disposing of only the specific legacies mentioned in the will offered for probate, and that he desired to retain the rest of his property as long as he lived, but he was told by a banker to whom he had mentioned this that he could not make a partial will. This was in the spring of 1923. He started talking about money matters, wanting to know how much money he had in the bank, and, on being told that there was around $6,000 or $7,000, wanted to know what had become of the difference between this and $12,000 that he thought he should have in the bank. He talked about making a will and the banker told him he would be glad to help him all he could, so they sat down and

the banker, Mr. Falk, asked him what he wanted in the will, and he took a piece of paper and named John Bockman, Johan Johnson, Oscar Erickson, and Alfred Larson; he asked him how much he wanted to give each one and Olson said to Bockman $350 and to the others $100 apiece, and that was all he wanted to have put in the will. Falk asked what he was going to do with the rest of his property and he said he did not want to will that away yet, that he wanted to keep the rest and make another will afterwards, and Falk told him that he did not think he could make a will that way, so the attempt was abandoned. Some time after Christmas in 1923 he came in with the same slip of paper and wanted Falk to draw up the will, and Falk told him he did not think that he could draw it satisfactorily and that he better go to Aberdeen and have it done. About two weeks later he came and told him that he had a lawyer draw a will and had the same names as before, John Bockman, Johan Johnson, Oscar Erickson, and Alfred Larson, and did not say anything about what he was going to do with the balance of his estate. Probably a month afterwards or in the early spring of 1924, Olson came to Falk and wanted him to go up to Aberdeen and look over the will, saying that he could not remember just whom he had named in the will, and he wanted Falk to go and see if it was all right; Falk told him that as long as he had filed it with the clerk of courts he could not do that. Falk was of Swedish nationality and was able to talk with deceased without any trouble.

On cross-examination, Falk testified that the reason he did not draw the will for Olson was because he wanted to make a partial will and keep the rest of his property, as he did not know how long he was going to live or if he would have enough, and asked Falk if he made a will if they (the beneficiaries?) could not come and take his property; that he came into the bank frequently and was quite a bother to Falk, who once in a while would try to get out of his way when he saw him coming because he was quite a nuisance, bothering about his property and his will.

We think, in view of the absence of any information in the record as to how this will came to be drafted or how the decedent came to change his intention with reference to respondent from the design to give him $500, a few days before the will was drawn, to giving him a residuary interest of the value of approximately $10,000 by the terms of the will, and in view of the testimony as to

decedent's mental peculiarities, that the error in refusing to permit respondent to be called and examined as an adverse witness cannot be said to be without prejudice.

■ Respondent contends that plaintiffs were required to show what they expected to prove if they had been permitted to call respondent as an adverse witness, but this contention is untenable, for the very purpose of permitting a party to be called as an adverse witness is to enable the party calling him to probe for information that he does not have, and to ascertain whether the party so called has knowledge of any facts bearing upon the subject of inquiry which the party calling him does not know of. To require the party calling such adverse witness to state what he expects to prove by him would, in most cases, defeat the very purpose of the statute.

■ One of the witnesses for plaintiffs was Mrs. O. G. Dokken, who was a single woman named Josephine Collin until after Olson's death. She was a niece of Olson's wife, and for a period of 25 years had visited with the Olsons on the farm and in town every year, staying from 6 weeks to 3 months at a time. She came to them a few days before Mrs. Olson's death and stayed from then on for 2 years and 3 months, keeping house for Mr. Olson. She testified that he was forgetful and mentioned other peculiarities, such as his continually talking about a will; that on one occasion he got a piece of cardboard and cut it up into strips and put cord through the strips and said that he was going to hang them on the chairs; that he spoke about his tree claim and whom he wanted it to go to, and said he was going to mark it off so as to show who should have different parts of it; that on one occasion he said he had lost his money, some $65 or $70, and wanted her to help him find it; this was while his wife was lying sick abed; that after her death, while the witness was looking for some clothes in the bureau, she found a little brown book in which was the money; that on another occasion he said he had lost his pocketbook with $5 in it and could not find it, and after some searching she found it under the corner of the mattress in his bed; that he lost his watch a number of times the same way; that on another occasion she saw him looking for something between the house and barn, and he said that he had put 50 cents on the ground so that it would be safe while he went to the barn and, on coming back from the barn,

was unable to find it; that she had assisted in the search but no 50 cents had been found; she was then asked what she had observed in reference to him losing his clothes and replied that that was a common occurrence; she was then asked if they were in such places that a person of ordinary mind could have found them, and, on objection that this question called for a conclusion of the witness, her answer in the affirmative was stricken out and the objection was sustained; she said that he frequently talked with her about making a will in the fall of 1923 and asked her to write down the names of the persons he wanted mentioned in the will; that the only names he gave her were those of Alfred Larson, John Bockman, Johan Johnson, and Oscar Erickson, that he never mentioned to her the name of N. E. Nelson or Peter Bunsness; that she had heard him express fear that Nelson would cheat him out of his property; that during the 25 years in which she had stayed more or less in the family she never knew of Nelson visiting him or helping him with his affairs in any way; that on one occasion in the summer of 1924 Olson went into a barber shop in Stratford to get a bath and came back with his clothing all disarranged, his undershirt on in place of his trousers and the lower part of his underwear on in place of a shirt. On objection of respondent this episode about the disarrangement of his clothing was stricken out as irrelevant and immaterial, being subsequent to the execution of the will. Mrs. Dokken further testified that, on the occasion of his going to Aberdeen on January 7, he learned of his cow being sick and was all broken up about that and was worried for several days so that he seemed to be all muddled up over it; that when he went to Aberdeen on January 11 he intended to come back that night, but did not; that she went down to the depot to meet him, but he did not come; that he came back the next night and said that he did not know where he had stayed over night; that Hans Bunsness had taken him to the depot in Aberdeen, and that he had wandered off some place, and that there was only one lamp left in Aberdeen. On motion of respondent this was stricken out as irrelevant and immaterial.

In vindication of the court's ruling in striking out evidence about the disarranged clothing, respondent cites Hosmer's Estate, 47 S. D. 147, 196 N. W. 545, and quotes therefrom as follows: "The condition of testatrix four hours after the will was executed

and from that time until she died was not material to any issue in the case, and the objection to these questions in the form they were asked should have been sustained." Neither the quotation nor the decision has any pertinency to the question involved in this case. In the Hosmer Case the decedent was suffering from uremic poisoning and was shown to be in full possession of her faculties at the time the will was executed, but was approaching that stage of the disease which often ends in coma and death, and the testimony showed that about 4 hours thereafter she lapsed into coma, which lasted until her death. In the present case the episode of the disarranged clothing occurred at a time when witnesses testified that Olson was in about the same condition physically and mentally as he had been for a long time prior to the execution of the will, and we think the court erred in striking out this testimony.

After having detailed the foregoing conduct on the part of Olson and having stated that, from what she had observed of his conduct, she would not say that he was insane on or about January 11, 1924, Mrs. Dokken was asked if she would say that he knew what property or money he had, to which an objection on the ground that it called for guesswork and a conclusion was sustained. She was then asked if on those days Olson's mind was such that he could comprehend the extent of his property, to which a like objection was sustained. She was then asked if she thought that on January 11 he had sufficient mind to grasp the contents of the will, which was objected to as not a proper hypothetical question and because no foundation had been laid therefor, which was sustained.

Without pursuing the examination further, it is sufficient to say that this witness and other witnesses for the plaintiffs, who had had quite extensive opportunity for observing the conduct and appearance of Olson, were precluded from giving their opinion as to his capacity to understand and comprehend the extent of his property and the nature of the contents of his will, while lay witnesses on behalf of respondent, who had far less opportunity for such observation, were permitted to give their opinion that he had such capacity.

A large part of the cross-examination of Mrs. Dokken was based upon the intimation that she had been promised a larger financial inducement for becoming a witness on behalf of plaintiffs

than the amount she would get under the will, and in respondent's brief this cross-examination is repeated by questions and answers, and it is argued that "she had entered into a collusion with contestants to furnish them testimony, and had some arrangement with them by which she expected to profit." In view of this intimation in impeachment of the credibility of Mrs. Dokken, plaintiffs offered in evidence a letter written by her to Rier Halvorson, one of the plaintiffs, before she had had any communication from any of the plaintiffs, in which she stated, in substance, that she had received a letter from Nelson's lawyers asking her for testimony to strengthen their claim, but was not going to side with them because she was sure Halleck Olson never planned on Nelson and Bunsness, and always talked about Nelson as if he were afraid that he took his money. On objection of respondent this letter was excluded.

In State v. Caddy, 15 S. D. 167, 87 N. W. 927, 91 Am. St. Rep. 666, this court considered the divergence of authority upon the question of sustaining the testimony of a witness by previous statements in harmony with such testimony, and, among other authorities cited, quoted from Glass v. Bennett, 89 Tenn. 481, 14 S. W. 1086, as follows: "The rule is, that when it is attempted to be established that the statement of a witness on oath is a recent fabrication, or when it is sought to destroy the credit of the witness by proof of contradictory representations, evidence of his having given the same account of the matter at a time when no motive existed to misrepresent the facts ought to be received, because it naturally tends to inspire confidence in the sworn statement." And this court adopted the rule of the case cited.

In 5 Jones' Blue Book on Evidence, p. 294, § 870, it is said: "Where the counsel on the other side imputes to the witness a design to misrepresent, from some motive of interest or relationship, in order to repel such imputation it may be shown that the witness made a similar statement before the supposed motive existed, or before the motive of interest prompted him to make a different statement of the facts."

In 40 Cyc. 2760, is the following: "In some jurisdictions it is considered proper to show that a witness assailed by proof of inconsistent statements had also made other prior statements consistent with his testimony; but the weight of authority is in support of the view that the witness cannot, in such case, be sustained by

proof of prior consistent statements, unless the purpose of such proof is to rebut an imputation of recent fabrication or motive to falsify and not merely to offset the effect of the proof of inconsistency." We think, since counsel for respondent had by his cross-examination of Mrs. Dokken intimated that she had entered into collusion with contestants to furnish them testimony and had made an arrangement whereby she expected to profit, the letter showing that before any such motive existed she had made statements consistent with her testimony should have been received.

William Swartz, the tenant on Olson's farm, testified that Olson used to come out to the place and try to fix up things, and that he frequently lost his tools; that he would come to the field where Swartz was working, a distance of from 80 rods to a mile, to ask him to come and help him find his hammer or other tools that he had lost; that in the summer and fall of 1923 he talked with him several times about making a will, but was under the impression that if he made a will they could come and take his property away from him; that in the spring of 1924 he told him that he had not willed his tree claim to anybody; that Nelson never was on the place except once in the fall after he had been appointed guardian; that in renting the place Swartz always dealt with Mrs. Olson, and that except on one occasion when Olson came out and tried to help divide the grain at threshing time, he did not conduct any business with Olson at all; that on the occasion of dividing the grain Olson tried to keep track of the number of loads hauled away and had 50 loads marked in a book when, as a matter of fact, there were but 31 loads hauled off, as was shown by the tickets issued, and that while Olson thought there were over 50 loads, Swartz took the matter up with his wife and had no difficulty in settling with her on the basis of the tickets issued. As with other witnesses for plaintiffs, Swartz was asked a number of questions calling for his opinion as to the mental capacity of Olson about the time of the execution of the will, but all such questions were excluded on the objection of respondent that the witness was not competent to give an opinion on the subject.

After Olson's death, on January 8, 1926, the will was read in the chambers of the county judge in the courthouse, respondent and others being present. Henry Locken, a witness who was present at the reading, testified that respondent read the will out loud and

was asked what respondent did or said after he got through reading the will. This was objected to as immaterial and not binding upon the proponents, whereupon plaintiffs' attorneys offered to show by the witness that, upon concluding the reading of the will on that occasion, Nelson leaned back in his chair and said, "That is a damn funny will"; and further said to the witness, "I'm glad that I didn't draw that will."

On cross-examination of the witness Falk, plaintiffs endeavored to show by various questions that on this occasion of the reading of the will respondent had said to Falk that he knew nothing of the contents of this will until after the will had been opened. All such questions were excluded, and an offer of proof to this effect was denied on the ground that it was not proper cross-examination and no foundation had been laid for impeachment. Such statements, if made by respondent, would be contradictory of his testimony that he had read the will to Olson before it was signed, and would be admissible unless foundation should have first been laid by asking respondent whether or not he had made such statements. The general rule is that no such foundation is necessary where the statements sought to be proved are those of a party to the action or proceeding, 5 Jones on Eidence, p. 231, § 851.

Peter Bunsness was a witness for defendant, and on cross-examination was asked if he had not, since the trial commenced, had a talk with Swartz, the tenant on Olson's farm, at the corner of Gannon's bank in the city of Aberdeen, in which he told Swartz not to make his testimony too strong because Bunsness and Nelson might own that farm yet, or words to that effect. An objection to this question was sustained on the ground that it was irrelevant, immaterial, and frivolous, and not proper cross-examination. The statement, if made, was obviously an attempt to intimidate and influence Swartz, who was a witness for plaintiffs, and was proper cross-examination.

The seventh finding of fact made by the court was to the effect that there was no competent evidence offered by contestants to establish relationship between contestants and the testator, and that the hearsay evidence offered by contestants, purporting to be family history, also disclosed that testator left surviving him a grandchild in Sweden, and that such testimony established the fact of this child's relationship as clearly as the relationship

claimed by contestants, and therefore it is not satisfactorily shown that contestants are heirs at law or otherwise entitled to maintain this contest proceeding. Assuming that the testimony relating to testator's alleged grandchild was admissible, yet such testimony showed beyond dispue that if any such grandchild existed it was the illegitimate child of an illegitimate daughter of the testator. The testimony as to the relationship of plaintiffs to testator established such relationship as completely as the testimony of any member of a family could establish the relationship of any other member of the family, at whose birth he was not present. Unless we are prepared to reject summarily undisputed evidence of a number of members of the family, it must be held that the relationship of plaintiffs to the testator is established by sufficient competent proof. It is shown beyond dispute that testator's mother was Ingeborg Erickson; that she was also the mother of Alfred Larson's mother, thus making Alfred Larson a nephew of testator. Testimony to this effect was given by 4 or 5 members of the family, some of whom had seen testator at his mother's home while she was alive and frequently heard her speak of him as her son. Ingeborg Erickson's husband never came to this country, but she, with a number of her chaildren, emigrated to America, and some time afterwards money was sent for testator to come to this country, and after his arrival here he was always considered by members of the family as the son of Ingeborg Erickson and the uncle of plaintiffs Larson and Erickson and half-brother of plaintiffs Halvorson and Renne. In the petition for probate of the will Rier Halvorson and Otto Renne were named among the heirs and devisees of the decedent, although neither of them was mentioned in the will. They could only be named in the petition for probate on the theory that they were related as heirs.

There is evidence tending to show that testator was an illegitimate child, and nothing to show that he had been acknowledged or adopted by his father. If he were legitimate and had died intestate, plaintiffs would be his heirs to the exclusion of the supposed grandchild in Sweden, and if he were illegitimate and had not been acknowledged or adopted by his father and had died intestate without lawful issue, his estate would go to his mother or, in case of her decease, to her heirs at law. Rev. Code, § 704. Therefore, if he were illegitimate, plaintiffs would likewise be his heirs,

to the exclusion of the supposed grandchild in Sweden, because if there is any such grandchild the testimony is uncontroverted that it is illegitimate and therefore not the lawful issue of testator.

After careful consideration of the entire record, we are of the view that the judgment and order appealed from should be reversed and the cause remanded for a new trial, and it is so ordered.

BURCH, P. J., and POLLEY and SHERWOOD, JJ., concur.

CAMPBELL, J., disqualified, and not sitting.