398 P.2d 448

Frank L. SHRIVES and Avis E. Shrives, his wife, Plaintiffs-Respondents,

v.

Thomas Lavon TALBOT and Nellie R. Talbot, his wife, Defendants-Appellants.

No. 9440.

Supreme Court of Idaho.

Jan. 12, 1965.

Motion to Dismiss Appeal Denied Feb. 11, 1965.

As Revised on Denial of Rehearing Feb. 11, 1965.

Racine, Huntley & Olson, Pocatello, for appellants.

Gee, Hargraves & Armstrong, Pocatello, for respondents.

TAYLOR, Justice.

March 17, 1961, plaintiffs (respondents) sold to defendants (appellants) certain farm property in Franklin county (hereinafter designated Weston property) and executed and delivered their warranty deed conveying the property to defendants. The purchase price was $40,000. In payment de-fendants executed and delivered their warranty deed conveying to plaintiffs a smaller farm owned by them in Franklin county (hereinafter designated Clifton property) in which defendants had an equity of $11,278.97, above an incumbrance, which plaintiffs assumed. The balance of the purchase price, $28,721.03, was paid by defendants' promissory note, secured by their mortgage incumbering the property conveyed to defendants by plaintiffs. The note bore interest at 5½ per centum per annum. The first payment to be made thereon was due January 15, 1962, and was for interest accruing to that date. The principal was payable in annual install-ments of $1,000 plus interest, commencing January 15, 1963. Delivery of the respec-tive properties accompanied the transac-tion. Other than the deeds, and the note and mortgage, no contract embodying the transaction was made.

The payment due January 15, 1962, was not made, and the entire principal and ac-crued interest became due. Plaintiffs com-menced this action for recovery on the note and foreclosure of the mortgage, April 11, 1962.

In their answer defendants allege they were induced to enter into the transaction and to execute and deliver the note and mortgage sought to be foreclosed, by false and fraudulent representations made to them by plaintiff Frank L. Shrives. The

representations which were alleged to have been falsely made are set out in appellants' brief as follows:

"1. That Respondents owned a ditch right of way across the lands of one Clyde Nielsen;

"2. That the house on the Weston property was in a liveable condition and in a state of good repair;

"3. That Respondents owned certain fences, gates, water trough and water heater;

"4. That Respondents had raised, and Appellants could raise, fall wheat on 120 acres of the land on the bench or that the 120 acres could be watered by means of a sprinkler system which could be put in in the spring and drain under the hill, and any crop could be raised thereon;

"5. That the farm had plenty of water; and

"6. That Respondents had good, clear title to the land."

Defendants also filed a counterclaim for damages alleged to have been suffered by them by reason of the fraud.

After trial to the court, findings, conclusions and judgment were entered for the plaintiffs and motion for a new trial was denied. Defendants brought this appeal from the judgment and the order denying a new trial.

The record does not show that Shrives made any specific representation as to the condition of the house. Necessary repairs thereto and to the water heater were made or offered to be made by plaintiffs. Neither does the record disclose that specific representations were made as to the ownership of the items mentioned in paragraph 3, supra. Defendants testified that Shrives told them there was plenty of water for the irrigation of the land. Shrives testified he told them only that the water available was represented by 40 shares in the Twin Lakes Canal Company and 6.87 shares in the Weston Creek Irrigation Company which was appurtenant to the land. Those shares were conveyed to defendants along with the land by plaintiffs' warranty deed. The water represented by those shares was used only upon the forty acre tract upon which the house and outbuildings were located. Defendants experienced a shortage of water on the irrigated tract during the irrigation season of 1961, which resulted in a poor yield by reason of which defendants were unable to make the payment of interest due plaintiffs in January, 1962. However, it appears from the record that the shortage of water was due in part to the fact that 1961 was a year of comparative drouth in the area, and in part to the difficulty defendants experienced in getting the water through the ditch on the neighboring farm of Clyde Nielsen. The use

of the ditch was "rotated." When it was Talbot's turn to irrigate, he, or his son, was required to go up the ditch, remove dams and fill cuts in the banks made by upper users. The filled cuts sometimes broke out, allowing the water to escape.

Defendants testified that Shrives represented to them that a right to carry water through the ditch upon Mr. Nielsen's land was appurtenant to the property conveyed. Shrives testified that the term "right of way" was never mentioned; that he told defendants the water would come through the Nielsen ditch and that it was a "common" ditch. Such a representation even though limited to the terms admitted by Shrives was such as to lead defendants to believe that a carrying right through the Nielsen ditch was appurtenant to the land. However, Nielsen (Shrives' brother-in-law) testified that in March, 1961, prior to the transaction between the parties hereto, Shrives brought defendant Talbot to Nielsen's home and that he, Nielsen, told Talbot that the ditch "was my private head ditch to my land" and that the water for the Weston land would come through that ditch subject to the same conditions as had previously been imposed upon such use; that is, that Talbot would be required to help maintain the ditch and to comply with other conditions theretofore agreed upon. This testimony on the part of Nielsen was not denied by defendants and, if true, was sufficient to put them on notice that no carrying right for irrigation water was appurtenant to the land.

The Weston property was divided into two parcels. The larger tract of some 200 acres was traversed by a drain which led from a spring on a neighboring farm. Some of the land below the drain was "sub-irrigated" by seepage. Although some crops had been grown thereon, its principal use was for pasturage. There were 120 acres on a bench above the drain. Defendants testified that on the occasion when Shrives was showing them this bench land, he told them that fall wheat had been grown thereon; that they could raise crops of fall wheat on that ground; and that they could put a sprinkler system in, drawing water from the drain ditch, and could raise any kind of crop on that land that they desired.

Shrives testified that he was asked only if we had raised fall wheat on that land and that he answered, "Yes"; that as to sprinkling the land, he was asked only whether it would be feasible to irrigate that land by means of a sprinkler system, drawing water from the drain; to which he answered, "To the best of my knowledge it could be done."

Plaintiffs' witness Benson, who as plaintiffs' tenant had farmed the Weston property the five years immediately preceding the transaction here involved, testified on

cross-examination that he had attempted to install a sprinkler system to use water from the drain but was prevented from doing so by Mr. Thompson, the neighbor who claimed the ownership of the water in the drain.

Mr. Talbot testified that while showing defendant the land Shrives said, "That drain is his" and,

"The drain could be stopped off and a sprinkling system be put in there and you could sprinkle the whole thing."

By "the whole thing" he referred to the 120 acres of bench land.

Mrs. Talbot testified that while showing the bench land, Shrives said, "the spring was his" and "We put the drain in ourselves. That's ours." That by "we", she understood him to refer to "his father and him" and, referring to the "dry farm up on top of the hill",

"Mr. Shrives said, 'You can raise good Fall wheat here.' Then he went on to say that if we would put a sprinkling system into that * * * spring and the drain that all of the land could be watered and we could raise any kind of crops we wanted."

Mrs. Talbot further testified that in the spring of 1961 she and her husband planned to irrigate the upper land by means of a sprinkler system, drawing the water from the drain, but were advised they could not do so.

The statements made by Shrives to defendants concerning the feasibility of drawing water from the drain for the irrigation of the bench land was such as to lead them to believe that the water flowing in the drain could be used upon the land through which it flowed.

The court found:

"VI Plaintiffs are residents of the State of Oregon and for many years have not lived on the property they were selling. Defendants were aware of these facts, and from their discussions knew that the Plaintiffs had not been operating the property. Defendants are residents of Franklin County, Idaho and have lived in the area for many years. They were introduced to preceding tenants of the Plaintiffs' property and were free to make any inquiry they desired concerning said property. Defendants were aware that Plaintiffs did not have intimate or first-hand knowledge of the histories of crop raising and condition of premises for several years preceding the sale."

"X That the plaintiffs did not make any misrepresentations as to the condition of the home, the premises, the history of the crops, the water or rights of way; that defendants were aware that plaintiffs had not occupied or operated the premises for several years prior to the sale; that the house was in a reasonably livable condition when trans-

ferred by plaintiffs to defendants; that any lack of water for the growing of crops was occasioned either by a general drought condition or by defendants' own conduct in not obtaining the water, and was not the result of any misrepresentation by plaintiffs; that the expenses of maintenance and operation were such as defendants could have reasonably anticipated and learned upon such investigation or inspection as was available to them.

"XI Defendants have suffered no damages; they have valued the property deeded by plaintiffs at prices from $45,000.00 to $59,000.00, all greater than the amount paid for the premises; that Defendant Thomas Lavon Talbot first denied the above and then subsequently admitted it."

The findings made indicate that the trial court relied quite heavily upon the fact that plaintiffs had not resided upon the property for a number of years and did not have firsthand knowledge of the crops raised and conditions affecting the premises, and that this was known to defendants. Such findings infer that defendants should not have relied upon statements made by the plaintiffs. However, the rule is otherwise. Plaintiff Shrives may not have been required to speak, but when he did speak it was his duty to state the facts fully and correctly, or to advise defendants

that he did not know the facts. As to matters concerning which Shrives did make representations, defendants were under no obligation to make an independent investigation or to inquire of plaintiffs' prior tenants.

"Elements of fraud generally consist of a representation or statement of a past or existing fact which is material, which is untrue; the speaker's knowledge of its falsity or ignorance of its truth; his intention that it should be acted on by the person to whom it is made; ignorance of its falsity on the part of the person to whom it is made and reliance on the representation; his right to rely upon it; his damage occasioned thereby. 37 C.J.S., Fraud, § 3, page 215." Weitzel v. Jukich, 73 Idaho 301, at 304, 251 P.2d 542, at 543 (1952).

In Burger v. Calek, 37 Idaho 235, 215 P. 981 (1923), this court quoted with approval from Erickson v. Fisher, 51 Minn. 300, at 303, 53 N.W. 638, as follows:

" 'As between the original parties, one who has intentionally deceived the other to his prejudice ought not to be heard to say, in defense, that the other party ought not to have trusted him.' " (37 Idaho at 238, 215 P. at 981).

and added:

"where the vendor makes material representations of fact concerning the condition or quality of the land or ar-

ticle sold, of such a nature that a man of ordinary prudence might rely upon them, the vendee is justified in so relying, and is under no duty to make an independent investigation." (37 Idaho at 239, 215 P. at 982).

In Gridley v. Ross, 37 Idaho 693, 217 P. 989 (1923), this court requoted with approval from Bigelow on Frauds, as follows:

" 'It matters not, it has well been declared, that a person misled may be said, in some loose sense, to have been negligent (in reality negligence is beside the case where the misrepresentation was calculated to mislead, and did mislead); for it is not just that a man who has deceived another should be permitted to say to him: "You ought not to have believed or trusted me," or "You were yourself guilty of negligence." This indeed appears to be true even of cases in which the injured party had in fact made a partial examination.' " (37 Idaho at 704, 217 p. at 991).

"False representations of a vendor as to the quantity of a tract of land which he offers for sale are not mere matters of opinion but are material and he cannot avoid their consequences merely because the vendee might have ascertained their falsity by a survey of the land or by reference to official plats and records.

"Even honesty in making a mistake is no defense as it is incumbent upon the vendor to know the facts. Taylor v. Lytle, 26 Idaho 97, 141 P. 92; 33 A.L.R. 1039; Miller v. Wissert, 38 Okl. 808, 134 P. 62; Culbertson v. Blanchard, 79 Tex. 486, 15 S.W. 700." Lanning v. Sprague, 71 Idaho 138, 143, 227 P.2d 347, 350 (1951).

In Brooks v. Jensen, 75 Idaho 201, 270 P.2d 425 (1954), this court held that failure of the buyer to acquire a small strip consisting of a ditch and dike for carrying water to the land sold, was of sufficient importance to justify rescission, and again said it was incumbent upon the vendor to know the facts which he purported to represent to the buyer.

In Summers v. Martin, 77 Idaho 469, 295 P.2d 265 (1956), and in Fuchs v. Lloyd, 80 Idaho 114, 326 P.2d 381 (1958), this court again held that it was incumbent upon the vendor to know the truth of the facts of which he spoke, and that the purchaser was entitled to rely upon representations made by the vendor.

In Janinda v. Lanning, 87 Idaho 91, 390 P.2d 826, 830, this court requoted with approval from 12 R.C.L. § 71, p. 310, as follows:

" 'Even though one is under no obligation to speak as to a matter, if he undertakes to do so, either voluntarily or in response to inquiries, he is bound not only to state truly what he tells.

but also not to suppress or conceal any facts within his knowledge which will materially qualify those stated. If he speaks at all he must make a full and fair disclosure.' "

No appurtenance is more important to, or more directly affects, the value of arid agricultural land than water and ditch rights for its irrigation.

■ The court's finding that defendants suffered no damage is not supported by the record. They lost their equity in the Clifton property and obtained very little, if any, advantage or recompense from their one year operation of the Weston farm. The court made no finding as to the value of the farms involved, either on the date of the transaction or on the date of trial. The $45,000 to $59,000 valuation of the Weston property recited in finding XI was based upon asking prices set out in real estate listings made by defendant Talbot in the winter of 1961 and the spring of 1962, when he attempted to sell the property after having farmed it one year. Such listings may have become competent to rebut testimony by defendants as to the actual value of the Weston land, but they were not conclusive on the issue of value, nor binding upon defendants. They were only what they purport to be, asking prices.

The findings indicate that the trial court, in reaching its decision, applied rules and principles which are not applicable to the determination of issues involving fraudu-lent representations, and which are contrary to the rules enunciated by this court. In view of this state of the record, we conclude that a new trial should be had.

■ Defendants also assign as error the rulings of the trial court precluding them from fully cross-examining the plaintiff Frank L. Shrives under IRCP 43(b). Defendants attempted to examine plaintiff Frank L. Shrives as to a conversation between him and defendants concerning the irrigation of the upper 120 acres. The court sustained plaintiffs' objection based on the rule that a party can be cross-examined only as to matters which are peculiarly within the knowledge of the witness and which are not otherwise readily available. This is the interpretation of I. C. § 9–1206 stated in Boeck v. Boeck, 29 Idaho 639, 161 P. 576 (1916) and re-affirmed by Willes v. Palmer, 78 Idaho 104, 298 P.2d 972 (1956), which were decided before the IRCP went into effect on November 1, 1958. IRCP 86 provides,

"These rules shall take effect on November 1st, 1958, and thereafter all laws and rules of Civil Procedure in conflict therewith shall be of no further force or effect."

The question is whether or not there is a conflict between I.C. § 9–1206 and IRCP 43(b).

Our main concern is what is the scope of the examination in chief of an adverse

party under IRCP 43(b). There is a dearth of cases on this subject since the majority of the federal cases construing IRCP 43(b) are concerned with the definition of an adverse party or the scope of the cross-examination of the adverse party by his own counsel. In Degelos v. Fidelity and Casualty Company of New York, 313 F.2d 809, 815 (5th Cir. 1963) the court said:

> "The right to put leading questions to an unwilling or hostile witness was long recognized and the rule introduced no new principle. But the addition of a specific right to call an adverse witness was new. It brought federal practice in line with the growing number of comparable state statutory provisions or court rules."

An examination of state interpretation of the various statutory provisions concerning adverse parties shows that the Boeck rule, supra, is in harmony with a majority of the states. Murry v. Manley, 170 Cal. App.2d 364, 338 P.2d 976 (1959); MacGregor v. Kawaoka, 132 Cal.App.2d 407, 282 P.2d 130 (1955); Lindsay v. Teamsters Union, Local No. 74 (N.D.) 97 N.W.2d 686 (1959); Emery v. Midwest Motor Exp., 79 N.D. 27, 54 N.W.2d 817 (1952); Langford v. Issenhuth, 28 S.D. 451, 134 N.W. 889 (1912); Suter v. Page, 64 Minn. 444, 67 N.W. 67 (1896). In Langford v. Issenhuth, supra, 134 N.W. at page 892, the court said:

> "It appears to us that the main purpose of this statute is to permit an adverse party to be called as a witness to prove or to be interrogated concerning facts material to the case of the party calling him, and that such witness may be called to prove a single material fact, or any number of material facts, even the whole case. The facts as to which the party calling such witness may desire to examine him are wholly within his discretion."

While this language is widely quoted and could be considered in conflict with the Boeck ruling, it has not been so interpreted. In re Olson's Estate, 54 S.D. 184, 223 N.W. 41, 45 (1929), the court said:

> "Respondent contends that plaintiffs were required to show what they expected to prove if they had been permitted to call respondent as an adverse witness, but this contention is untenable, for the very purpose of permitting a party to be called as an adverse witness is to enable the party calling him to probe for information that he does not have, and to ascertain whether the party so called has knowledge of any facts bearing upon the subject of inquiry which the party calling him does not know of."

In Daggett v. Atchison, Topeka & Santa Fe Ry. Co., 48 Cal.2d 655, 313 P.2d 557, 562, 64 A.L.R.2d 1283 (1957), the court made this observation:

> "Section 2055 has been held to be remedial in character and a statute to be construed liberally to the end that litigants would be afforded an opportunity to elicit from adverse parties the facts which *those parties have in their sole possession.*" (Emphasis supplied.)

The California cases which have widely quoted the Langford case have dealt only with situations where the knowledge has been peculiar to the witness or where the trial judge refused to allow the party to be called in the first instance. Intagliata v. Shipowners & Merchants Towboat Co. (Cal.App.) 151 P.2d 133 (1944); Lawless v. Calaway, 24 Cal.2d 81, 147 P.2d 604 (1944); MacGregor v. Kawaoka, supra; Murry v. Manley, supra.

Moran v. Pittsburgh-Des Moines Steel Co., 183 F.2d 467 (3rd Cir. 1950) and United States v. United States Gypsum Co., 67 F.Supp. 397 (D.C.1946), cited by defendants to support their position, are not in point. The Moran case is the only one which was concerned with the examination in chief under the rule. However, in that case the question was confined to whether the adverse witness could be examined on events transpiring during a period of time before he was appointed managing agent of the defendant corporation. Since the defendants have cited no cases, and we have found none, which define the scope of examination in chief under Federal Rule 43(b), we are inclined to presume that no conflict exists with the Boeck rule. Therefore, IRCP 43(b) will be interpreted in harmony with the Boeck rule.

In view of the conclusion reached, it is unnecessary to consider other errors assigned.

The judgment is reversed and the cause is remanded for a new trial.

Costs to appellants.

KNUDSON, C. J., and McQUADE, J., concur.

Motion to dismiss and petition for rehearing denied, February 11, 1964. McQUADE, C. J., and KNUDSON, J., concur. McFADDEN and SMITH, JJ., dissent.

McFADDEN, Justice (dissenting).

This action is one of foreclosure of a real estate mortgage executed to secure payment of a promissory note. Defendants filed an amended answer and counterclaim seeking, on the basis of fraudulent statements alleged to have been made to them by respondents, a rescission of their agreement with plaintiffs, cancellation of the note and mortgage, return of certain real property conveyed by defendants to plaintiffs, or its money equivalent, and for

certain damages for loss of crops, plus the value of improvements made by appellants.

In the amended answer and counterclaim of the defendants, the following are set forth as the false and fraudulent statements alleged to have been made by the respondents, and upon which they rely as the basis for their defense to the complaint and for their counterclaim:

"(a) That Plaintiffs owned a ditch right of way across the lands of one, Morris Jessup, for irrigating the above described real estate.

(b) That the house on the above described real estate was in a liveable condition and in a state of good repair.

(c) That Plaintiffs owned certain fences, gates, water trough and water heater.

(d) That Plaintiffs had raised, and Defendants could raise, fall wheat on 120 acres of the land on the hillside then owned by Plaintiffs or that the 120 acres could be watered by means of a sprinkling system which could be put in the spring and drain under the hill, and any crop could be raised thereon."

In the Findings of Fact, the trial court found:

"V.

"Prior to the execution of the instruments above mentioned and during the negotiations between the parties, defendants went upon the premises being offered by Plaintiffs and observed and inspected the house, outbuildings, the lands and related items being sold.

"X

"That the plaintiffs *did not make any misrepresentations as to the condition of the home, the premises, the history of the crops, the water or right of way*; That the defendants were aware that plaintiffs had not occupied or operated the premises for several years prior to the sale; that *the house was in a reasonably livable condition when transferred by plaintiffs to defendants*; that any lack of water for the growing of crops was occasioned either by a general drought condition or by defendants' own conduct in not obtaining the water, and was not the result of any misrepresentation by plaintiffs; * * *" (Emphasis supplied.)

In conjunction with such finding of fact, the trial court concluded, among other things:

"II

"Defendants have failed to establish the allegations of their Counter Claim and are not entitled to any recovery or relief thereon."

From my examination of the record there appears to be conflicting evidence of a substantial nature on all the issues

presented on the question of fraudulent representations alleged to have been made by the plaintiffs to the defendants. The conflict in this testimony is reflective of the versions of what took place as related by the parties to this action. and the conflict was resolved by the court against the appellants.

Fraud is not to be presumed, but must be proven in each of its elements by clear and convincing evidence; Nelson v. Hoff, 70 Idaho 354, 218 P.2d 345; Lott v. Taylor, 60 Idaho 263, 90 P.2d 975; Barron v. Koenig, 80 Idaho 28, 324 P.2d 388; Walker v. Nunnenkamp, 84 Idaho 485, 373 P.2d 559. One of the basic and essential elements of fraud, that must be proven is that there was a representation of facts that was false, Walker v. Nunnenkamp, supra; Weitzel v. Jukich, 73 Idaho 301, 251 P.2d 542. Here the trial court specifically found that there was no such misrepresentation, and thus an essential element of the claim of fraud is absent.

This court has repeatedly held that the findings of the trial court will not be disturbed on appeal when supported by competent and substantial, although conflicting evidence, Thomson v. Marks, 86 Idaho 166, 384 P.2d 69, and cases therein cited.

Although the trial court did consider the fact that the plaintiff had not resided upon the property for a number of years, no inference from that alone is sufficient to reverse the judgment in this case. This court cannot presume any error as being inherent in the trial court's finding of fact in that regard. In Conley v. Amalgamated Sugar Co., 74 Idaho 416, 263 P.2d 705, this court stated:

"After the court has found, the criteria are not what other or different findings the evidence could or would sustain, not what findings are plausible, not the weight or quality of the evidence or credibility of witnesses, but the sole criterion is simply whether there is substantial evidence, regardless of conflict, to sustain the findings as made, with all reasonable inferences and intendments in favor thereof. This proposition is so universal, so oft repeated and adhered to as to need no citation of authority in support thereof. It is not what evidence tends to support appellant, or negative that favorable to respondents, but it is what evidence tends to support respondents, with all reasonable inferences and intendments to be drawn in favor of respondents, which controls the determination of the controversy in this Court."

In Judy v. Reilly Atkinson & Co., Inc., 59 Idaho 752, 87 P.2d 451, it is stated:

"In Hill v. Porter, 38 Idaho 574, 223 P. 538, sec. 4 of the syllabus is as follows:

" 'It is presumed that the decree of a district court is regular and valid,

and the burden of establishing error is on the party alleging it.'

"See also, Donahoe v. Herrick, 44 Idaho 560, 260 P. 150, and 5 C.J.S. Appeal and Error, § 1533, p. 262, wherein it is said:

" 'It is a general rule of wide application that an appellate court will indulge all reasonable presumptions in favor of the correctness of the judgment, order, or decree from which the appeal was taken. In other words it will be presumed on appeal, absent contrary showing, that the trial court acted correctly and did not err, and that the court will correctly settle such questions as may arise in further proceedings in the cause. Indeed error is never presumed on appeal, but must be affirmatively shown by the record; and, since the appellate court need not search the record for possible errors, the burden of so showing it is on the party alleging it, or, as sometimes stated, the burden of showing error affirmatively is upon appellant or plaintiff in error. Appellant or plaintiff in error, under the foregoing rule placing the burden upon him to show error, must show that the record will not support the judgment on any theory.' "

See also: I.R.C.P. 52(a); Angleton v. Angleton, 84 Idaho 184, 370 P.2d 788; Wm. Walker Co. v. Pocatello Monument Co., 71 Idaho 294, 230 P.2d 701; Loosli v. Heseman, 66 Idaho 469, 162 P.2d 393.

It is my conclusion that the judgment in the instant action, being a decree of foreclosure and order of sale, should be affirmed.

SMITH, J., concurs.