384 P.2d 69

**Roger D. THOMSON and Malissia A. Thomson, husband and wife, Plaintiffs-Appellants,**

**v.**

**Carlton MARKS and Evelyn Marks, husband and wife, Defendants-Respondents.**

**No. 9188.**

Supreme Court of Idaho.

July 23, 1963.

Thomas A. Mitchell, Coeur d'Alene, for respondents.

C. J. Hamilton, Coeur d'Alene, for appellants.

SMITH, Justice.

Appellants (plaintiffs), purchasers under a contract entered into December 28, 1959, for the sale and purchase of real and personal property, brought this action March 13, 1961, for rescission of the contract and restoration of moneys paid on the purchase price and expended on the property. After a trial without a jury, the district court granted respondents' (defendants') motion for dismissal, and entered judgment dismissing the action with prejudice. Appellants have appealed from the judgment.

The contract required payment of an agreed purchase price of $12,000, payable $2624.00 as the down payment, and the balance at $80 a month with interest, commencing on or before January 8, 1960. The contract provided, should purchasers default in payment or fail to keep any other covenant thereof, that sellers, upon 30 days' written notice of default, could declare the contract at an end and retake possession of the premises, retaining payments made thereunder as liquidated damages for purchasers' use and occupancy of the property.

Appellants defaulted under the contract in that they failed to pay the December 1960 and January 1961 installments, and to pay certain taxes. In consequence thereof respondents, on January 18, 1961, notified appellants in writing of their defaults, demanded correction thereof within 30 days, and warned appellants that upon their failure so to do respondents would terminate the contract.

On February 23, 1961, appellants notified respondents in writing that they, appellants, had rescinded the contract because of respondents' alleged misrepresentations with respect to flooding and the water supply of the real property covered by the contract; appellants tendered the properties back to respondents; also demanded refund of sums paid on the contract together with their expenditures for certain improvements to the property.

Thereafter, on March 13, 1961, appellants filed their action for rescission of the contract. They alleged that respondents had represented to appellants that "said land had adequate and pure domestic water and was free from flooding;" also that the land which the parties inspected was as referred to in the contract, whereas "in fact a 50 foot strip of the aforesaid land had been previously sold to the State of

Idaho;" appellants then alleged the falsity of such representations, and the remaining elements of fraud in the inception of the contract, and that the "misrepresentations were not apparent or ascertainable to plaintiffs (appellants) on their inspection of said land." Appellants prayed for rescission, and restoration to them of $4,992.55 which they alleged represented money they had paid on the contract and expended for improvements to the premises.

Respondents by their answer denied appellants' allegations of fraud and damage, and affirmatively alleged, by reason of appellants' failure to cure their default, that on March 9, 1961, respondents had caused to be returned to them all papers which had been escrowed by the parties pertaining to the contract, and had terminated the contractual relationship.

At the conclusion of a trial by the court, without a jury, the court granted respondents' motion for dismissal of appellants' action pursuant to I.R.C.P. Rule 41(b), on the ground of appellants' failure of proof of fraud on respondents' part as regards the subject matter of the contract. The court entered findings of fact and conclusions of law to the effect that appellants had failed to show that respondents, or anyone acting in their behalf, were guilty of fraudulent representations to appellants in connection with the transaction, as they

had alleged. The court thereupon entered judgment of dismissal of the action with prejudice, and this appeal resulted.

Appellants in urging error committed in the dismissal of the action, assign error of the trial court in finding that the evidence was insufficient to show fraudulent representations on the part of respondents or their agents as regards (1) a 50 foot strip of frontage property included in the described property which respondents sold to appellants; (2) the land being subject to flooding; and (3) the purity of the domestic water supply.

Those assignments require a review of the evidence in order to determine whether it is sufficient to sustain the findings and judgment of the trial court.

*The Boundary Issue.*

The real property covered by the contract in relation to which the highway right of way exists is referred to in brief form as follows:

The portion of U. S. Lot 5 in Section 4, Township 49 North, Range 2 W.B.M., lying north of U. S. Highway Project No. I–IN–5041(5) Highway Survey on file in the office of the Department of Highways, State of Idaho;

Also that part of Section 5, said Township and Range, lying north of U. S. Highway Project bordered on the

east by Wolf Lodge Creek (the description contained in the contract sets forth detailed distances and directions along Wolf Lodge Creek and is shown to be in Section 5);

(and other property not involved in the boundary issue); all such property being situate in Kootenai County, Idaho. A right of way map of the Department of Highways of the State of Idaho admitted in evidence shows that the portion of right of way involved in this action borders the referred to real property at the south, immediately north of former U. S. Highway 10, and now north of Interstate Highway Project No. I–IN–5041(5). Such portion of the right of way is 50 feet wide at its easterly boundary and extends westerly, in uniform width, about 350 feet, and then continues westerly about 300 feet additionally, widening at its westerly boundary to some 115 feet or thereabout.

An old fence, or "farmers fence", borders the north boundary of the former U. S. Highway 10. This fence, plaintiffs assert, is the southern boundary of the property they contracted to purchase, and it is located approximately at the southern boundary of the portion of the right of way involved herein.

A photostatic copy of a warranty deed is in evidence showing that respondents conveyed to the State of Idaho the property included in such portion of the right of way, and additional property for right of way purposes; the deed is dated August 22, 1958, and was duly recorded September 10, 1958, in the office of the Kootenai County recorder.

Mr. Sacht, an engineer for the Department of Highways, testified that the description of the real property covered by the contract included the portion of the right of way involved herein.

The issue thus presented to the trial court was whether respondents represented to appellants that the contract was intended to include or exclude such portion of the right of way; and if it was intended that the contract exclude it, whether appellants so understood such intendment, and through error the real property description contained in the contract included such portion of the right of way.

Mr. Kelley, the realtor, testified that before the Receipt and Agreement to Purchase was entered into by the parties he conversed with respondents, the owners, concerning the description of the property, "as to where the boundaries were:" then he checked the property stating, "the boundaries at that time were quite well staked out by the highway department. * * * we were going by the fence line, the existing fence line and existing state survey stakes which were very evident at that time;" that he and respondent, Mr. Marks, walked about the entire boundary,

and that on the south side of the property "at that time the fence and the survey stakes differed."

Mr. Kelley identified the old fence which he designated "a farmers fence," as paralleling the former U. S. Highway 10 near its north boundary. He then testified:

"Q. * * * on the south side of the property you said Marks pointed out to you where that boundary was and said it consisted of some stakes and a fence?

"A. I stated at that point on the south side of the property the stakes— the survey stakes and the fence differed."

He was testifying in relation to the right of way map of the Department of Highways.

Mr. Kelley was then asked to use a blackboard on which he made certain lines and drawings at the request of appellants' counsel; the blackboard is not in evidence. His testimony appears to have related to the fence line running parallel to the former U. S. Highway 10, and to the line of stakes placed by the Department of Highways to the north of the fence line, in conformity with the north line of the right of way line. He also testified concerning a steel fence, the steel posts of which had been installed and which differed from the old fence. Mr. Kelley then stated that

each time he took Mrs. Thomson to the property he pointed out the south boundary of the property which was the steel fence installed by the State, which differed from the "farmers fence." He further testified, on direct examination by appellants:

"Q. Do you recall how high from the level of the ground those stakes were?

*    *    *    *    *    *

"A. Probably about a foot.

"Q. What were they?

"A. Regular survey stakes.

"Q. Now when you showed the property to either or both the Thomsons, do you recall specifically pointing out those stakes?

"A. I pointed out the fence. I pointed out how it was aimed along those stakes."

On cross examination he testified:

"Q. Now, you mentioned this farm fence alongside of U. S. Highway Number 10. Was that ever represented to you by the Marks as being their present boundary line? A. No.

"Q. Did you ever represent it to the Thomsons as being the boundary line?

"A. No. Because the other fence was already aimed down through there. * * * "

Mr. Sacht, the engineer for the Department of Highways, called by appellants identified the portion of the right of way involved herein as acquired by the State, although included in the description contained in the contract. On cross examination he testified concerning the construction by the Highway Department of the right of way boundary line fence. He stated that the Department commenced construction of the fence during April 1959, but had not finished its construction.

Appellant Mr. Thomson stated that his talk with Mr. Kelley at the property about the boundaries was rather general. He knew of the stakes on the east end of the pasture, which would be the end of the highway fence. He said that there was a permanent marker. He admitted the discussion with Mr. Kelley about the south boundary line of the property, and "that it ran somewhere along the fence *of* [at] the front." While Mr. Thomson's testimony indicates that he was apprised of the approximate location of the north boundary of the highway right of way, he then asserted that he would not have contracted to purchase the property if he had been advised that the 50-foot right of way strip was not included in the property covered by the contract.

Respondent Mrs. Thomson maintained that the old fence was on the southern boundary of the property; she didn't know that a portion of the property had been sold to the state for highway purposes, and she did not notice the stakes in front of the property; although she didn't walk over to the highway fence at the south boundary. She left the boundary matter to her husband.

After appellants had visited and examined the property at least three times with Mr. Kelley, they then entered into the initial Receipt and Agreement to Purchase on December 9, 1959. Mr. Kelley therein set forth the description of the property involved in the right of way dispute, as follows:

"That part of lot 5 N. of hiway less right of way in Sec 4 Twp 49 R2WBM; Tax #3567 less right of way in Sec 5 Twp 49 R2WBM;"

On direct examination he was asked:

"Q. For clarification of the record, Mr. Kelley, the property description shown here [in the Receipt and Agreement to Purchase] was enlarged before the contract was entered into?"

He answered:

"I understand it was, yes. We get the legal description from the Treasurer and the Treasurer's legal description usually gives a tax number to define a certain piece of property, * * * whereas the legal description on their records would be too lengthy to keep

in their books; therefore you get the rest from the Assessor, the metes and bounds description, that is."

The Receipt and Agreement to Purchase bears out Mr. Kelley's version of the transaction relating to the disputed portion of the right of way. That initial agreement shows beyond dispute that the particular property intended by respondents to be sold and conveyed to appellants did not include the portion of the State's right of way involved herein, situate north of the Interstate Highway. Moreover, appellants by their execution of such instrument after their discussions had with Mr. Kelley, relating to the boundaries of the property, are shown to have had knowledge of the exclusion of such right of way from the land for which they contracted. Further, respondents, by their execution of such initial agreement, have shown that they intended exclusion of the right of way from the property which they intended to sell and convey to appellants.

The error which occurred was a mutual mistake. The record shows what both parties intended, i. e., that the land to be covered by the contract excluded such portion of the State's right of way, whereas the formal contract, when drafted, included in the description contained therein the right of way property, which neither party intended. The misconception in the description was shared by both parties.

The evidence additionally bears upon appellant Mr. Thomson's knowledge of the existence of the State's right of way. On the property covered by the contract he built a fence running generally in a north-south direction; but he stopped its construction at a point about 50 to 60 feet north of the old fence or "farmers fence," bordering the former U. S. Highway 10. He then admitted he knew that the Highway Department had surfaced with blacktop 50 feet beyond the old fence and acknowledged the "existence of the new fence built up to the new right of way line." He also admitted that respondent Mr. Marks had explained that "the State had indicated that it was all right to use that property [right of way] as long as the State did not need it" including a corner of a pasture affected by the right of way.

This case is to be distinguished from Lanning v. Sprague, 71 Idaho 138, 227 P. 2d 347. In that case the vendor Sprague offered to sell a certain block of land, the north boundary being represented to extend 15 feet north of a certain fence line and which property the plaintiffs Lannings contracted to purchase, relying upon defendant Sprague's said representations; whereas in fact the north boundary extended 70 feet south of the fence. Actually the representations concerning the north 85 feet of the property were false; but Lannings were unaware of such falsity.

In the case at bar respondents truly represented that the State's right of way bordered the Interstate Highway north of the old fence, or the "farmers fence"; also the State's right of way fence was shown to appellants; and the Receipt and Agreement to Purchase excluded the right of way from the property covered by the contract. Respondents truly represented the south boundary of the property and appellants knew its location. The unfortunate error occurred in the formal agreement of December 28, 1959, concerning which appellants had no knowledge until about the time they commenced this action. They had no knowledge thereof in February 1961 when they gave the notice of rescission, and nowhere does the record indicate their reliance upon such error in the description.

After considering the evidence which is somewhat conflicting the trial court resolved the boundary dispute in favor of respondents. The court found that respondents did not, nor did any one acting in their behalf, represent to appellants that the property to be sold was to include all of the property north from the existing old fence running parallel to the former U. S. Highway No. 10, which is not the frontage for Interstate Highway 90; particularly, the court pointed to the testimony indicating that the boundary line of the highway right of way was clearly defined by highway stakes at the time the property was shown, which stakes were north of the old fence line; and that appellants admitted that the realtor pointed out the south boundary line in a general manner to them.

The trial court properly concluded that appellants failed to establish by clear and convincing evidence that any fraud was perpetrated upon them by respondents or anyone acting in their behalf.

*The Issue of Flooding.*

The evidence shows that the property covered by the contract flooded in May or June of 1960. The water was up to the second step of the newer dwelling house on the property. After that flood appellants improved the older log house on the property.

According to an engineer for the Department of Highways the whole area flooded during 1957. He testified that the area would not flood at all unless Coeur d'Alene Lake is too full of water, which causes the water to back onto the bordering land, including the Marks place (the property covered by the contract); that a combination of high water level in the lake and the spring runoff is required, in order that flooding may occur.

Appellants stated that nobody told them that the property did or did not flood. Appellant Mrs. Thomson did not recall any

conversation with respondent owners or with the realtor in regard to the flooding, prior to the time the contract to purchase the place was entered into during December 1959. While she stated she was not interested in any place that flooded, the record indicates that the realtor's conversation with Mrs. Thomson, who interviewed him about the purchase of the property, was that they, appellants, wanted a place in the country, they liked to have a creek running through it, and she was enthusiastic over a log constructed type of building.

Mr. Kelley, the realtor, contacted the owners, respondents, whose property fairly conformed to Mrs. Thomson's specifications. After showing the property to appellants three times, the agreement for the sale and purchase was consummated.

Mr. Kelley had been informed, because of his work in the area, that under high water conditions water would leave the creek banks but he did not know how far. He knew that the creek through the property had been rerouted but he did not know what effect the rerouting would have on the property. He was referring to Cedar Creek which runs through the property. He knew that in the past the property had flooded some, although he had never seen the water surrounding the dwelling house on any previous occasion, as high as shown by the exhibits [photographs] of the flooding during the spring of 1961.

Mr. Kelley's cross examination shows that neither he nor appellants ever mentioned the subject of flooding; that appellants did want a place in the vicinity of Coeur d'Alene Lake, having a creek running through it, and respondents' property met such requirements.

The record fails to show that respondents or any one acting in their behalf made any representations of any kind to appellants, concerning whether the lands in question were subject to flooding from any cause. The finding of the trial court in the premises thus is sustained by the evidence.

*The Issue of Purity of Domestic Water Supply.*

Mr. Kelley, the realtor, testified that respondents indicated to him that before they would sell the property they wanted to make sure that the domestic water was pure and that they intended to install a water purifier; that if the water then tested pure they would go ahead with the sale and purchase transaction with appellants.

The machine, intended for purification of the water, was installed. After the second testing the water tested suitable for domestic use, which is borne out by a water analysis report by Idaho's Department of Health. The water sample from respond-

ents' property was received by such Department on January 8, 1960, and the report is dated January 11, 1960; it states that intestinal bacteria were not found in the sample of water. The sanitarian, Mr. Boughton, of the Department of Health, stated that water which showed absence of such bacteria is considered suitable for domestic purposes.

The realtor recalled going to the property after appellants moved onto it; that a man had been installing the machine to purify the water; that appellants were using the water, and at that time the water had been cleared by test by the Department of Health. Mr. Kelley specifically stated that he never told appellants that the water was pure at any time prior to installation of the water purifier. He stated that the pureness of the water was essential to the contract. When he went to the property after appellants had moved onto it, the installation of the water purifier was being completed. He stated he wanted to ascertain whether this water purifying machine would be satisfactory to them, appellants, and that they stated it was satisfactory. He told appellants that respondents were "footing the bill" for the purifier.

Mr. Kelley's testimony also showed that during negotiations with appellants, it was brought out that the owners would clean up the water supply; they would install the machine, and if that didn't take care of the water supply, something else would be done.

Appellant Mr. Thomson testified that before purchasing the property, he was informed that the drinking water was not as pure as it should be. He knew that respondents were attempting to remedy the situation and had ordered a water purifier. He stated that he did not sign the contract of sale and purchase (on December 28, 1959) before the purifier was installed.

It was when the 1960 flood came, he testified, that a sample of the water showed contamination, but he caused the water system to be cleaned and the well to be sunk deeper. He then stated that there was no problem of the drinking water during the latter part of 1960 and early 1961 (while he continued in possession).

The owners, respondents blamed the water contamination to the highway construction going on in the vicinity which was completed in October 1960. Mr. Thomson did not know whether the water was contaminated thereafter, but that the water was clear and appellants used it.

Appellant Mrs. Thomson knew of the conversation with the realtor, before they contracted to buy the property, about the purity of the water. She then denied that anything was said before signing the contract about the purity of the water or water supply; and she didn't remember the report of the Department of Public Health

of January 11, 1960, showing uncontaminated water.

There is some conflict in the evidence on the question of the purity of the drinking water supply, in regard to whether before the purchase appellants were informed about the then questionable purity of the water supply. The trial court resolved the conflict in favor of respondents. The remaining evidence is substantial in support of the trial court's finding that respondents did not, nor did any one in their behalf, falsely represent the purity of the domestic water supply; and that respondents did remedy the situation to the end that the State's Department of Public Health cleared the water for drinking purposes by January 11, 1960.

Appellants by their remaining assignment contend that the trial court erred in finding that Mr. Kelley and the realty company which employed him, acted as agents for both appellants and respondents in the transaction involved herein. We have carefully examined the evidence bearing upon this aspect of the case and find no error in the trial court's finding.

■ The credibility of witnesses and the weight to be given their testimony is exclusively within the province of the trier of the facts. Harper v. Johannesen, 84 Idaho 278, 371 P.2d 842; In re Odberg's Estate, 67 Idaho 447, 182 P.2d 945; Cren-

shaw v. Crenshaw, 68 Idaho 470, 199 P.2d 264; Sellars v. Sellars, 73 Idaho 163, 248 P.2d 1063; Angleton v. Angleton, 84 Idaho 184, 370 P.2d 788.

■ Fraud is never presumed. All the essential elements thereof must be established by the party relying thereon by clear and convincing evidence, especially when the integrity of a written instrument is assailed. Nelson v. Hudgel, 23 Idaho 327, 130 P. 85; Smith v. Johnson, 47 Idaho 468, 276 P. 320; Cooper v. Wesco Builders, 76 Idaho 278, 281 P.2d 669; Petersen v. Holland, 79 Idaho 63, 310 P.2d 810; Barron v. Koenig, 80 Idaho 28, 324 P.2d 388; Walker v. Nunnenkamp, 84 Idaho 485, 373 P.2d 559.

■ The findings of the trial court will not be disturbed on appeal when supported by competent and substantial, although conflicting, evidence. I.C. § 13–219; Shurrum v. Watts, 80 Idaho 44, 324 P.2d 380; Manley v. MacFarland, 80 Idaho 312, 327 P.2d 758; Larson v. Lindsay, 80 Idaho 242, 327 P.2d 775; Homefinders v. Lawrence, 80 Idaho 543, 335 P.2d 893; Nordick v. Sorensen, 81 Idaho 117, 338 P.2d 766; Clayton v. Clayton, 81 Idaho 416, 345 P.2d 719; Zenier v. Spokane International Railroad Co., 78 Idaho 196, 300 P.2d 494; Dunclick, Inc. v. Utah-Idaho Concrete Pipe Co., 77 Idaho 499, 295 P.2d 700; Summers v. Martin, 77 Idaho 469, 295 P.2d 265; Land Development Corporation

v. Cannaday, 77 Idaho 237, 290 P.2d 1087; Watkins v. Watkins, 76 Idaho 316, 281 P.2d 1057.

The judgment of the trial court is affirmed.

Costs to respondents.

McQUADE, McFADDEN and TAYLOR, JJ., concur.

KNUDSON, C. J., did not participate.