393 P.2d 724

**MOUNTAIN ELECTRIC COMPANY, a corporation, Plaintiff-Appellant,**

v.

**Gilbert SWARTZ and Louise L. Swartz, husband and wife, Defendants-Respondents.**

No. 9396.

Supreme Court of Idaho.

July 6, 1964.

Racine, Huntley & Olson, Pocatello, for appellant.

McDevitt & McDevitt, Pocatello, for respondents.

SMITH, Justice.

Appellant brought this action seeking to foreclose its second mortgage encumbering real property of respondents, given to secure payment of their promissory note. Repondents denied the indebtedness, and counterclaimed for all sums paid to appellant, claiming that appellant "unjustly and wrongfully received" the same through "coercion and threats and undue influence" of respondents.

Trial by a jury, by assent of appellant and respondents, resulted in a verdict and judgment of $3,880.06 in favor of respondents on their counterclaim. Appellant has appealed from an order denying its motion for directed verdict, from the resulting adverse judgment, and from an order denying its motion for a new trial.

Appellant corporation engages in the business of selling and repairing household appliances in Pocatello. Respondent Gilbert Swartz, herein sometimes referred to as Swartz, had been employed by appellant for some 15 years prior to the bringing of this action. He was a good worker, enjoyed an excellent reputation in the vicinity of Pocatello based on the high caliber of

his services, and was instrumental in developing the repair phases of appellant's business. He had free access at all times to appellant's establishment and was allowed the use of a company truck. He could purchase parts, for appliances being repaired, from local merchants, and was generally permitted to pursue his work without interference from the management.

Appellant's repairmen, including respondent, were required to keep daily time cards which listed customers served, parts used, and time spent in repairs. Appellant customarily billed the customer for the work performed, but occasionally a customer would pay a repairman who, upon submitting the work order to appellant's bookkeeper, would pay the money received to the bookkeeper. Unless a repairman, personally taking a work order, reported it to the office, appellant would have no record of such work. Unless a repairman paid over the cash received from a customer for work performed, appellant would be ignorant of the payment unless the customer subsequently brought the matter to appellant's attention. A Mr. Burnett, appellant's expert witness and a certified public accountant, testified that the accuracy of appellant's bookkeeping system depended upon the honesty of its employees.

In this respect, appellant's witness, a Mrs. Durrell, testified that Swartz had re-paired her washing machine on different occasions, for which she made payment to him by check. In the spring of 1960, Swartz installed a new water pump in the machine, for which service Mrs. Durrell paid him $25. Later, Mrs. Durrell mentioned this transaction and the cost to appellant's bookkeeper. Swartz had told the bookkeeper that this particular job had been cancelled and insisted that such was the case even after the cancelled check had been turned over to appellant's manager. A few weeks later, however, Swartz turned in the money for this particular job.

Appellant's manager, a Mr. Jackson, testified that Swartz had obtained items from other merchants, charging them to appellant, but which he, Swartz, had used personally, including tires and oil. He also testified that he missed two appliances from appellant's stock of merchandise which he could not trace to any particular employee because of the nature of the bookkeeping system; also, that it was impossible to determine how much Swartz had failed to turn in to the company for repair work.

Because of those asserted losses Mr. Jackson employed the services of the Ridgway Company, a California agency which specialized in this type of investigation. Its representative, Jackson and Swartz met together the evening of November 25, 1960, in a hotel room in Pocatello. Jackson testified that Swartz readily confessed to em-

bezzling $20 a week in money and merchandise during a period of 630 weeks of his employment by appellant, amounting to $12,600; Swartz also wrote and signed three almost identical letters, to that effect, addressed to Jackson, each in the nature of a confession. The full context of one such letter is set forth below.[1]

Swartz, on the other hand, testified that Jackson and the Ridgway representative accused him of having misappropriated company funds; that if he did not confess to those shortages, his relatives and other people would be informed of what he had done. The substance of Swartz's testimony is to the effect that he was coerced into writing the confessions; that although he denied to Jackson and the representative that he had taken any company money, he signed the confessions because "I was so upset by those guys a-dinging at me that I didn't know what I was doing."

Additional testimony of Mr. Jackson on cross examination indicates that, excepting for the $25 check which Swartz received for repairing Mrs. Durrell's washing machine,—a job he insisted had been can- celled,—appellant had not, at the time of trial, compiled any direct evidence, other than the confessions, indicating that Swartz had misappropriated any of appellant's property. Jackson further admitted that at no time had he ever confronted Swartz "man to man" and directly accused him of misappropriation of funds, the reason being that "We considered Mr. Swartz a very valuable employee; he had a wonderful reputation as a service man, so we decided to overlook some of these * * * trivial matters; because we wanted to maintain our reputation in the community as a desirable place to do business * * *."

On November 26, 1960, the Ridgway representative and Jackson met with appellant's counsel, Mr. Racine, and showed him the confessions which Swartz had written and signed the previous evening. The representative left Pocatello later that day. Appellant subsequently paid the Ridgway Company $1,500 for its services.

On November 28, 1960, Jackson and Swartz met with Mr. Racine who thereupon stated that he was appellant's counsel in the matter. In regard to that meeting, Mr.

---

1. "Nov. 25–1960
"Mr. J. H. Jackson
 "the Following facks contain in this letter I am giving you of my own free will and accord with out any threats, promises of any kind or any other abuses after my legal rights have been fully explained to me.
 "During my Impenployemt with the Mt. Electric Co or for the past 630 weeks I been stealing money & merchandis on and average of $20.00 per week for the past 630 weeks or the total amount of moeny including I have stolen is $12,600.00, twelve thousand six hundred dollars. it has been expland to me today I have not been promised immunity from prosecution or freedom from arrest. which I understand.
 Gilbert C. Swartz."

Racine testified that Swartz at no time denied taking the money; and that "he simply wanted to do what was right and get it over with, and * * * if possible to stay in the employment of Mountain Electric." Racine also advised Swartz to seek legal advice if he had any questions concerning the matter. Swartz also testified he regarded Mr. Racine's advice as "honest and trustworthy." At the same meeting, Jackson agreed to settle appellant's claim with Swartz for $6,000, a portion thereof to be paid in cash.

On January 13, 1961, respondents, Swartz and his wife, met with Mr. Racine at his law offices, and executed their promissory note for $3,000 in favor of appellant, secured by a chattel mortgage encumbering their real property (a second mortgage); and they paid the remaining $3,000 of the account in cash. In return for this note and mortgage, Racine gave respondents a release signed by Mr. Jackson, as president of appellant, the intent of which was to "release and discharge the said Gilbert Swartz and Louise L. Swartz from all claims, demands, or liability of every kind and character arising out of or by reason of the employment of Gilbert Swartz by Mountain Electric Company * * *," providing that they paid the full amount of the promissory note. In regard to the execution of the note and mortgage, Mr. Racine testified that Mrs. Swartz felt that her husband could not have misappropriated any funds; and that what they were doing "could not be right." Racine again told respondents to seek advice if there was any question in their minds concerning the transaction.

In regard to the January 13, 1961, meeting with Mr. Racine, Mrs. Swartz testified that she and her husband had not obtained legal advice prior to that meeting but instead, relied on Mr. Racine's advice; that her reason for signing the note and mortgage was because "any wife would have did it, under the circumstances. If you couldn't raise the money, if you didn't have the money that was the only thing that was left * * * to do."

Two days after this meeting, i. e., on January 15, 1961, Swartz met with an attorney, a Mr. Phillips, in Pocatello. Mr. Swartz did not disclose the results of that meeting. Beginning on the same day, January 15, 1961, respondents began making monthly payments of $75.00 each on the promissory note, which they continued to make until March 6, 1962, at which time they had made 14 payments. Whether respondents made any attempt to secure legal advice during that period of time is not disclosed in the record. Respondent Swartz continued in the employ of appellant until August 5, 1961, when he terminated the job of his own volition. During that period of approximately seven months, his earnings totalled $4,124.58.

Respondents stopped making payments ·on their promissory note after March 6, 1962, upon advice of counsel. Appellant filed suit on August 11, 1962. Respondents, in answering the complaint and counter-·claiming for sums they had paid appellant, for the first time alleged that the note and mortgage executed almost 21 months earlier, on January 13, 1961, were executed ·under circumstances amounting to fraud .and duress. The jury, in returning a ver-·dict for respondents in the sum of $3,880.06 ·on their counterclaim in effect found re-·spondents to be entitled to their payments made to appellant in cash and on the promissory note, and the judgment for such sum in effect returned respondents to the relative position they were in prior to execution of the note and mortgage.

Appellant assigns as error the trial court's refusal to give appellant's requested jury instruction No. 7, designed to instruct the jury that fraud is never presumed but must be proved by clear and convincing evidence; and particularly, that the burden of proof is upon the party, assailing a written intrument on grounds of fraud, to prove the fraud by clear and convincing evidence; nor did the trial court give any jury instruction in the premises. Rather, by Instruction No. 3 the court instructed: "When I say that a party has the burden of proof on any proposition, or use the expression 'if you decide', I mean you must be persuaded considering all the evidence in the case, that the proposition on which he has the burden of proof is more probably true than not true." At the best, such instruction cannot be construed beyond instructing the jury that each party must prove the theory of his case by a preponderance of the evidence.

Respondents assail the integrity of their promissory note and the securing mortgage, given in favor of appellant, in that in their pleadings they alleged that appellant obtained the same by fraud, undue influence and coercion; and that it was by virtue of such fraud that respondents made all the payments to appellant.

Fraud is never presumed, it must be proved by clear and convincing evidence, especially where the integrity of a written instrument is involved. Janinda v. Lanning, 87 Idaho 91, 390 P.2d 826 (1964); Thomson v. Marks, 86 Idaho 166, 384 P.2d 69 (1963); Walker v. Nunnenkamp, 84 Idaho 485, 373 P.2d 559 (1962); Barron v. Koenig, 80 Idaho 28, 324 P.2d 388 (1958); West v. Prater, 57 Idaho 583, 67 P.2d 273 (1937). The rule is equally applicable in cases of duress, Van Meter v. Zumwalt, 35 Idaho 235, 206 P. 507 (1922), and undue influence, Ford v. Ford, 44 Cal.App. 415, 186 P. 164 (1919); see also Shinn v. Smith, 81 Idaho 57, 336 P.2d 690 (1959).

Appellant's requested Instruction No. 7 correctly stated the law; i. e., that

fraud must be proved by "clear and convincing evidence." The trial court refused the instruction and otherwise failed so to instruct the jury; instead the court, by Instruction No. 3, instructed that the burden of proof would be met by a lesser degree of proof. The failure to instruct the jury on the requisite burden of proof was prejudicial to appellant's interests and constituted reversible error. Clark v. Federal Motor Truck Sales Corporation, 175 Wash. 438, 27 P.2d 726 (1933); 5A C.J.S. Appeal & Error § 1763(3) (1958).

In the light of our disposition of this appeal by the granting of a new trial, I.C. § 1–205 admonishes us to determine questions of law which may be necessary to the final determination of the case.

Appellant, in its motions for a directed verdict and for a new trial, and in its assignments of error, asserted the insufficiency of the evidence to show fraud or duress on appellant's part at the time respondents executed their note and mortgage in the office of appellant's counsel; also, that the evidence when examined in a light most favorable to respondents shows that duress imposed on respondents, if any, occurred during the evening of November 25, 1960, when Swartz was confronted by Mr. Jackson and the respresentative of the Ridgway Company. Appellant then notes that 49 days went by from the evening of November 25, 1960, until January 13, 1961, when respondents executed the note and mortgage, and that appellant's counsel, Mr. Racine, made no threats on that occasion; that respondents voluntarily executed the instruments in consideration of a formal release executed by Mr. Jackson on behalf of appellant, and delivered by Mr. Racine.

In the light of those facts, appellant contends as a matter of law, that fraud grounded on duress cannot be sustained, because of respondents' full knowledge of the facts and circumstances involved, respondents having had ample time and opportunity for investigation and reflection, particularly since they had 49 days in which to obtain legal advice had they desired, in order to ascertain their rights in the matter, but made no attempt to do so. Appellant's position is persuasive and is supported by authority. See Ensign v. Home for Jewish Aged, 274 S.W.2d 502 (Mo.App.1955); Tanner v. West, 339 Mo. 738, 99 S.W.2d 7 (1936); Palatucci v. Woodland, 166 Pa.Super. 315, 70 A.2d 674 (1950); cf., Otto v. Powers, 177 Pa.Super. 253, 110 A.2d 847 (1955); 17 C.J.S. Contracts § 168 at 949 (1963).

We are constrained to the view however that lapse of time and opportunity for reflection are but additional circumstances to be considered and, in view of the conflicting evidence in the trial record, that the trial court correctly submitted the question of duress to the jury for its consideration as the trier of the facts. As stated in

Restatement of Contracts, § 492, comment c. (1933):

"The length of time that elapses between the act or threat which is asserted to amount to duress, and the transaction attacked is likewise important only as evidence bearing on the issue of whether fear produced by the act or threat continues to operate at the time the transaction is entered into, in such force as to preclude free judgment. A state of such fear may continue long after the threats that cause it, but in determining the probability of this, time, distance, opportunity to obtain disinterested advice and protection, are all important."

See also 17 C.J.S. Contracts § 168, supra.

Appellant next contends that as a matter of law duress cannot invalidate a contract subsequent to its execution, where the party claiming duress recognizes his obligation under the contract, as by making payment on a promissory note, thus ratifying the transaction. Appellant did not advance the theory of ratification in its pleadings or in support of its motions for directed verdict and a new trial, but raises this issue for the first time on appeal. A review of the evidence indicates, however, that an issue of ratification was squarely raised by the evidence presented at the trial, and thus merits discussion inasmuch as a new trial must be granted.

A recent annotation in 77 A.L.R.2d at 426 (1961) shows the great weight of authority upholding or recognizing the rule that contracts voidable for duress may be ratified by subsequent acts of the party claiming the duress. The following language appears at pages 428 and 441.

"A contract entered into under duress is generally considered not void, but merely voidable, and is capable of being ratified after the duress is removed, such ratification resulting if the party entering into the contract under duress intentionally accepts the benefits growing out of it, remains silent, acquiesces in it for any considerable length of time after opportunity is afforded to avoid it or have it annulled, or recognizes its validity by acting upon it." Supra at 428.

"The making or acceptance of payments according to the terms of a contract allegedly induced by duress after the duress has ended was held to show a ratification thereof * * * [Citations]." Supra at 441.

See also Bair v. Spokane Sav. Bank, 186 Wash. 472, 58 P.2d 819 (1936); Restatement of Contracts, §§ 484, 499 (1933); Annot., 35 A.L.R. 866 (1925). Respondents' sole citation of authority in regard to such issue, i. e., 17A Am.Jur., Duress and Undue Influence, § 26 (1957), is in harmony with the principle of law last above quoted and

states the rule in substantially the same language. We quote certain testimony of respondent Swartz to show that it may become necessary to dispose of the issue of ratification upon a new trial, as follows:

"Q. Now, you left the Mountain Electric Company in August of 1961, didn't you? A. Yes, sir.

"Q. And the fact is, Mr. Swartz, you quit of your own accord, and you were not fired? A. Yes.

* * * * * *

"A. I handed the keys to the fellow * * * in charge * * * and told him I was through because I was afraid they would get me into something else.

* * * * * *

"Q. Yes. In fact that was ten months after you had signed a confession, and approximately seven months after you had signed the note and mortgage that you continued working for the Mountain Electric Company; is that not a fact? A. Yes.

"Q. And you worked all this time * * * on the basis of your story that you were completely innocent of any charges and that they had falsely accused you of stealing money from them? A. That is right.

* * * * * *

"A. * * * they wanted me to stay there and work, is the reason why I worked. * * * I like appliance work.

"Q. But you continued to work for an employer who had coerced you, as you say, into signing a confession for $12,600.00 when you were an innocent man?

"A. That is right.

* * * * * *

"Q. Isn't it a fact, Mr. Swartz, that you contacted Mr. George Phillips, at attorney at law * * * concerning this matter [execution of the note and mortgage]?

"A. I talked to him a little bit, yes.

* * * * * *

"Q. And that was before you signed the note and mortgage?

"A. That was afterwards. * * * about two days afterward.

* * * * * *

"Q. And that was way back in January of 1961? Almost two years before you filed any claim in this matter through another attorney; is that not a fact?

"A. Almost that, yes.

* * * * * *

"Q. And that in January of 1961 you signed the note and mortgage, and you paid on that note and mortgage for some fourteen months? That is also the fact? A. Yes, sir.

"Q. And during that fourteen months you were also free to go about the city of Pocatello, and talk to anyone you pleased, and consult with anyone you pleased, is that not the fact? A. Yes, sir.

"Q. It is also a fact you quit paying in March of 1962? A. Yes, sir.

\*     \*     \*     \*     \*     \*

"Q. And then four or five months went by, even after you quit paying, even after you talked to Mr. McDevitt, a long time after you talked to Mr. Phillips \* \* \* and still claimed to be an innocent man, and you never brought any action against the Mountain Electric Company until you \* \* were first sued; that is the fact, isn't it?

"A. I decided I did not owe them the money and they had gotten it out of me in an unscrupulous way, and that I wasn't the one that got the money.

\*     \*     \*     \*     \*     \*

"A. I thought it over \* \* \* and finally decided I was not going to pay that if they were going to sue me, let them sue \* \* \*.

\*     \*     \*     \*     \*     \*

"Q. But the fact still remains that you never filed suit for any of this un-til after the plaintiff had sued you, some five months later? You never took any action?

"A. I left it up to the attorney.

\*     \*     \*     \*     \*     \*

"Q. And you say you didn't file suit because Mr. McDevitt told you not to?

"A. I didn't say he told me not to file suit. I said he told me not to pay."

Except for respondent's testimony, "I was afraid they would get me into something else," and similar statements, there is nothing in the evidence to indicate that respondent, under duress, continued for 14 months to make payments on the promissory note. Moreover, he continued in the employ of appellant, reaping substantial earnings, until in August, 1961, when he left the job of his own volition. We are constrained to the view, however, that ratification is an additional issue of fact for determination by the trier of the facts under proper instructions. Fritchen v. Mueller, 132 Kan. 491, 297 P. 409 (1931); see also Esau v. Briggs, 89 Cal.App.2d 427, 201 P.2d 25 (1949); Restatement of Contracts, § 492, supra.

In view of our disposition of this proceeding, appellant's remaining assignments of error, although carefully considered, require no present discussion.

Judgment reversed and the cause remanded for a new trial.

Costs to appellant.

KNUDSON, C. J., McFADDEN and TAYLOR, JJ., and MARTIN, D. J., concur.