421 P.2d 133

Frank L. SHRIVES and Avis E. Shrives, His wife, Cross-Defendants-Appellants,

v.

Thomas Lavon TALBOT and Nellie R. Talbot, His wife, Cross-Plaintiffs-Respondents.

No. 9922.

Supreme Court of Idaho.

Dec. 8, 1966.

Gee, Hargraves & Armstrong, Pocatello, for appellant.

Racine, Huntley & Olson, Pocatello, for respondent.

SPEAR, Justice.

Shriveses (appellants) brought this action as vendors against the Talbots (re-

spondents) to recover on a promissory note and to foreclose a mortgage. Talbots answered and counterclaimed for damages and for rescission, because of allegedly fraudulent representations made by Mr. Shrives.

This is the second appeal in this matter, the opinion of this court on the first appeal being reported in Shrives v. Talbot, 88 Idaho 209, 398 P.2d 448.

Frank Shrives and his wife, on March 17, 1961, sold certain farm property (hereinafter designated as the Weston property) situate in Franklin County to the Talbots for $40,000.00. For a down payment the Talbots transferred to Shriveses a smaller farm also located in Franklin County (hereinafter designated as the Clifton property) in which Talbots owned an equity of $11,278.97 over and above an encumbrance which Shriveses agreed to assume. The balance of the purchase price, i. e., $28,721.03, was represented by Talbots' promissory note secured by their mortgage on the Weston property, i. e., the property transferred to them by Shriveses. At the time Shriveses filed the foreclosure action on the purchase mortgage in April, 1962, Talbots were unquestionably in default on the note, for with the exception of one small water assessment Talbots had paid no principal, interest, taxes or insurance as required under the terms of the promissory note and mortgage. However Talbots plead as a defense and as a counterclaim that they had been fraudulently induced to purchase the Weston property and to execute and deliver the note and mortgage by certain false and fraudulent statements purportedly made by Frank Shrives, the husband appellant. In the amended answer and counterclaim Talbots allege four different fraudulent misrepresentations. In the first trial the trial court held against Talbots on all these representations and the supreme court affirmed such judgment on all but one, i. e.:

"That plaintiffs had raised, and defendants could raise, fall wheat on one hundred and twenty acres of land on the hillside then owned by plaintiffs or that the one hundred and twenty acres could be watered by means of a sprinkling system which could be put in the spring and drain under the hill, and any crop could be raised thereon."

The Weston property was divided into two parcels. The larger tract of some 300 acres was traversed by a drain which led from a spring on an adjoining farm and which fed into the West Cache Canal which cut across the far end of the property in a direction approximately at right angles to that of the drain. Some crops had been grown on the lower 180 acres of this larger tract, but its principal use was for pasturage. There were 120 acres on a bench above the drain at an additional elevation of about 90 feet. The land on the bench is sandy loam soil, unlike the heavier soil found below. No crop had been successfully raised on the bench property since at least 1955. Two springs located some distance apart along the path of the drain at the bottom of the hill fed into the drain. The flow of water along the drain fluctuated between 25 to 50 inches, dependent upon the time of year and the amount of irrigation on the properties comprising the water table which feeds the drain. The smaller parcel consisted of 40 acres upon which the house and outbuildings are located. These 40 acres are irrigated, but from a source other than the drain. The 120 acres on the bench are classified as dry farm land.

Shrives is a design draftsman and resides in Portland, Oregon. He had inherited the Weston property upon the death of his father. Through correspondence, resulting from an advertisement placed in the Preston, Idaho, newspaper, Talbots arranged to meet with Frank Shrives at the Weston property and look over the farm. The agreement previously mentioned herein was reached and the property sold. Shrives had not lived upon nor farmed that property for many years and was without intimate or first-hand knowledge of the farm. This fact was known to the Talbots. Talbots had farmed in the Franklin County area for many years and presumably were some-

what more familiar than Shrives with the problem of farm operation in that area. They inspected the property and also were introduced to the preceding tenant, from whom they might have elicited information concerning the Weston property.

The conflicting evidence introduced by the respective parties relative to the alleged misrepresentation by Shrives that the 120 acres of bench dry land could be watered by means of a sprinkler system drawing water from the drainage ditch under the hill and that thereafter any crop could be raised thereon, is set forth in detail in the opinion of the court in the first appeal (Shrives v. Talbot, 88 Idaho 209, 398 P.2d 448) and repetition here is unnecessary. Suffice it to point out, the trial court found against Talbots' contention in this respect but this was reversed by this court and remanded for a new trial. The law of this case was thus set by this court in the following portion of that decision to be found in 88 Idaho at page 215, 398 P.2d at page 451:

"The findings made indicate that the trial court relied quite heavily upon the fact that plaintiffs had not resided upon the property for a number of years and did not have firsthand knowledge of the crops raised and conditions affecting the premises, and that this was known to defendants. Such findings infer that defendants should not have relied upon statements made by the plaintiffs. However, the rule is otherwise. Plaintiff Shrives may not have been required to speak, but when he did speak it was his duty to state the facts fully and correctly, or to advise defendants that he did not know the facts. As to matters concerning which Shrives did make representations, defendants were under no obligation to make an independent investigation or to inquire of plaintiffs' prior tenants."

On the retrial, January 1966, the evidence, both oral and documentary, adduced at the previous trial, as set forth in the reporter's transcript or record thereof, was by stipulation adopted and made a part of the record of the second or retrial. In other words, the second trial was merely supplementary of the first. Evidence relevant to the alleged misrepresentations made by Shrives was primarily a reiteration by both parties of the evidence submitted in the first trial. Examination principally was directed to establishing whether in fact the Talbots could draw water from the drain in sufficient amounts to economically irrigate the 120 acres of dry land on the bench. Talbots further sought to show the irrigation of the bench property was not a feasible operation, economically speaking, even had water in the drain been available as a source for the sprinkler system. One of Shriveses' own expert witnesses testified that at best this would be a marginal operation. Also on the retrial there was introduced a written recorded agreement between the adjoining landowners (Washington Thompson et ux and Frank Shrives, Sr., the father of appellant husband herein) which provided for the joint construction, use, maintenance and cost of maintenance of the drain and for a right of way of 20 feet on each side of the center of the drain across the Thompson property as well as the Shrives or Weston property as referred to herein. Other evidence adduced proved that damming or obstructing the drain ditch for the purpose of securing sufficient water for a sprinkler system upon the bench land would defeat the entire purpose of the drain ditch and result in sub-irrigating, not only the 180 acre parcel of the Weston property adjoining the drain but also the property of neighboring landowner (McKay) to the extent of destroying crops growing thereupon.

On the basis of the evidence contained in the record of the first trial as supplemented by that adduced in the second trial, the trial court made the following pertinent findings of fact:

"XII.

"That prior to the execution of the aforementioned deeds, promissory note and mortgage and while the parties were negotiating upon the north 300 acres of

the Weston property owned by Plaintiffs, Plaintiff, Frank Shrives, Jr., referring to the upper 120 acres of bench land located on said tract and the spring and drain located below said bench land on the remaining 180 acres, made the following representations to Defendants:

"(a) That water could be removed from the drain extending from the original Thompson property and extending through the Shrives' property and emptying into the West Cache Canal;

"(b) That the drain was his;

"(c) That this water in the drain could be pumped upon the bench land and crops could be grown thereon;

"(d) That it would be feasible to install a sprinkler system in said drain and pump water to the bench lands for crops, and that any crops could be raised thereon;

"(e) That fall wheat had been grown on the bench land and that they could raise fall wheat on that ground.

"XIII.

"That the above representations by Plaintiff were material and untrue or half true because:

"(a) That at the time of making said misrepresentations there was an agreement on record between Washington J. Thompson and his wife and Frank Shrives, Sr., and his wife, the owners of the property when the drain was dug and placed into effect, a copy of which at trial was marked as a joint exhibit and incorporated herein by reference thereto; this agreement provides for the joint construction, use, maintenance and costs of maintenance of the drain and for a right of way of 20 feet on each side of the center of the drain.

"(b) That the drain if dammed up near the boundary of the Thompson-Shrives' property will make the Thompson and adjoining property too wet for farming purposes and would defeat the purpose of the drain. The soil types of the Shrives property and the Thompson property in the vicinity of the drain are generally the same and the damming of the drain for the purpose of installment of a sprinkler system would adversely affect the adjacent property.

"(c) That the flow of the water in the drain fluctuates between 25 to 50 inches, depending upon the time of year and the effect of irrigation on the lands adjacent thereto comprising the water table which feeds the drain.

"(d) That the optimum use of this size stream on the sandy loam soil on the 120 acres of bench land would not be over 40 acres.

"(e) That to place water on the bench land from the drain would require a lift from a pump of at least ninety feet because of the difference in elevation between the land and the drain, plus a piping of 500 to 600 or more feet to get to the boundary of the sandy loam, plus an additional main line in the land to be irrigated.

"(f) That to install such a sprinkler system, considering the expense involved and the supply of water, would at the very best produce only a marginal result, and would, in fact, not be a feasible operation for that area.

"(g) That no crop has been successfully raised on the bench land since at least 1955.

"XIV.

"That the said Plaintiff was ignorant of the truth of said representations and intended that Defendants should act upon the same.

"XV.

"That the Defendant relied upon the misrepresentations made by the Plaintiff and acted thereon by purchasing said property in ignorance of their falsity.

"XVI.

"That the north 300 acres was the bulk of the land in the sale for the raising of crops and the misrepresentations materi-

ally affected the use and value of this land."

The court concluded that the agreement between Thompsons and Shrives, Sr. created a drain easement and a covenant running with the land which prohibited either party from interfering with the operation of the drain without the consent of the other, and that the water in the drain was not available for use by Talbots as represented to them by Frank Shrives, Jr.; that it was incumbent upon the plaintiff, Frank Shrives, Jr., to know the facts which he represented to the defendants to be true, since they were material and intended to induce the defendants to act; that no appurtenance is more important to or more directly affects the value of arid agricultural land than water and ditch rights for irrigation, that representations of plaintiff Shrives were made with such knowledge of their importance, and that because thereof Talbots were entitled to rescind the transactions between the parties and to be restored to their former position.

Based upon these findings and conclusions, the trial court entered judgment allowing Shrives nothing by way of their complaint and granting Talbots judgment on their counterclaim granting rescission of the warranty deed of the Weston property by Shriveses to Talbots and also permitting rescission of the promissory note and the mortgage executed by the Talbots to the Shriveses. The judgment further provided that within thirty days Shriveses should pay to Talbots the sum of $11,278.97, or in the alternative, at the election of Shriveses, Shriveses should deliver to Talbots the Clifton property and appurtenances (the down payment property conveyed to Shriveses by the Talbots). Should the Clifton property be returned to Talbots, they were granted thirty days within which to reimburse Shriveses for all payments including interest made by Shriveses on the mortgage on the property assumed by Shriveses as part of the 1961 agreement and thereupon the warranty deed used to convey the Clifton property

from Talbots to Shriveses would be rescinded.

From this judgment Shriveses appealed.

█ In the first assignment of error counsel for Shriveses contends that findings of fact XII(c), (d) and (e), XIII(b), (d), (e), (f), (g), XIV, XV, XVI and the conclusions of law based thereon, are either immaterial, inconsistent, conjectural, incorrect or not sustained by clear and decisive evidence as shown by the record. All of these findings are set out in full previously herein. This contention is erroneous. All these findings of the trial court are supported by substantial, competent, although in some instances conflicting, evidence and will not be disturbed upon appeal. This principle was ably expressed in the dissenting opinion in the first appeal of this matter (Shrives v. Talbot, 88 Idaho at 211, 398 P.2d at p. 455, citing Thomson v. Marks, 86 Idaho 166, 384 P. 2d 69). More recent cases in which this court, by unanimous decision, has adhered to this principle are Jackson v. Blue Flame Gas Co., 90 Idaho 393, 412 P.2d 418; Meridian Bowling Lanes, Inc. v. Brown, 90 Idaho 403, 412 P.2d 586; Fairchild v. Matthews, 91 Idaho 1, 415 P.2d 43; and McKenney v. Anselmo, 91 Idaho 118, 416 P.2d 509.

█ Shriveses contend, however, that this principle is not applicable to fraud cases because all the essential elements of fraud must be established by the party asserting fraud, by clear and convincing evidence. The rule, that such degree of proof is necessary before the trial court, is well established in Idaho. Andrus v. Irick, 87 Idaho 471, 394 P.2d 304; Janinda v. Lanning, 87 Idaho 91, 390 P.2d 826; Thomson v. Marks, supra; Walker v. Nunnenkamp, 84 Idaho 485, 373 P.2d 559; Barron v. Koenig, 80 Idaho 28, 324 P.2d 388; Nelson v. Hoff, 70 Idaho 354, 218 P.2d 345. However, whether such alleged fraud has been proven by clear and convincing evidence is solely the determination of the trier of fact. On appeal that determination will not be reversed where supported by competent,

substantial, though conflicting, evidence. Gem-Valley Ranches, Inc. v. Small, 90 Idaho 354, 411 P.2d 943, 948, where this court was discussing the question of whether the evidence had established by clear and convincing evidence that a conveyance absolute on its face was in reality a mortgage. In holding that this is a question primarily for the trial court, the case of Wright v. Rosebaugh, 46 Idaho 526, 269 P. 98 (1928), was quoted with approval as follows:

"The trial court is the appropriate tribunal to weigh the evidence, and determine whether it is convincing and satisfactory, within the meaning of the rule. It has been said that in such cases, as in others, the determination of that court in favor of either party upon conflicting or contradictory evidence is not open to review in the appellate court. [citing two California cases]"

See also Jones v. Adams, 67 Idaho 402, 182 P.2d 963.

■■ Of the various essential elements of fraud, i. e., (1) a misrepresentation of a material past or existing fact; (2) the untruth or falsity of such representation; (3) the speaker's knowledge of its falsity or ignorance of its truth; (4) his intention that it should be acted upon by the person to whom it is made; (5) ignorance of its falsity on the part of the person to whom it is made; (6) reliance on a representation; (7) his right to rely upon it; and (8) his damage occasioned thereby (Shrives v. Talbot, 88 Idaho at page 215, 398 P.2d 448), counsel for Shriveses in this appeal, both in his brief and in his oral argument before the court, relied principally on Talbots' failure to prove elements (1), (6) and (8). The misrepresentation concerning the availability of irrigating water and the feasibility of a sprinkler system on the bench 120 acres which permit the growing of any crop, as more particularly set out in the court's finding of fact XII, is amply supported by substantial and competent evidence. The conflicting evidence by Shrives himself was resolved by the trial court in favor of the version testified by the Talbots and this will not be disturbed upon appeal. But Shriveses contend that such statements were not representations of a past or present fact but mere opinion of future possibility. If this were true, such contention would be valid under the holdings in Barron v. Koenig, supra; Nelson v. Hoff, supra, and other prior holdings of this court, but there is more than mere opinion as to future possibility in the representations made by Shrives. Counsel for Shriveses, in cross-examining Talbot in the retrial, made every effort to establish this future possibility theory, but the closest he came to succeeding was in the following questions by Mr. Gee and answers of Talbot:

"Q So that the questions about irrigating the plateau, the bench land, and the other lands were future possibilities?

"A He says it could be.

"Q These were future possibilities, weren't they, sir?

"A Well, he says that's what could be. He says that you could do it. If he said you could do it, I guess that would be up to the future.

"Q. Well, you knew that it would take a great deal of work, didn't you, sir—

"A. Well—

"Q. In order to get the water up on the hill?

"A. It would, but there's no water there, no way you could get it. You'd have to dig a well or something."

The trial court was correct in concluding that the misrepresentations made by Shrives concerned past or existing facts, not mere opinion as to future possibilities.

■ Next Shriveses contend Talbots were not entitled to, and in fact did not, rely upon Shrives' misrepresentations. That Talbots did not have the right to rely upon the representations of Shrives is completely answered in this court's opinion on the first appeal, Shrives v. Talbot, 88 Idaho, at pp. 215–217, 398 P.2d 448, wherein this court quotes with approval

from Burger v. Calek, 37 Idaho 235, 215 P. 981 (1923); Gridley v. Ross, 37 Idaho 693, 217 P. 989 (1923); Brooks v. Jensen, 75 Idaho 201, 270 P.2d 425 (1954); Summers v. Martin, 77 Idaho 469, 295 P.2d 265 (1956); Fuchs Realty Co. v. Lloyd, 80 Idaho 114, 326 P.2d 381 (1958); and Janinda v. Lanning, 87 Idaho 91, 390 P.2d 826. Thus this is the law of the case and the Shriveses are bound by it on this appeal. United States Building & Loan Ass'n v. France et al., 58 Idaho 95, 70 P.2d 374; Creem v. Northwestern Mutual Fire Ass'n of Seattle, Wash., 58 Idaho 349, 74 P.2d 702; Southeast Securities Co. v. Christensen, 70 Idaho 338, 218 P.2d 342.

■ Concerning the contention that Talbots did not in fact rely upon these representations the court's finding of fact XV that Talbots did in fact rely upon the misrepresentation, is amply supported by Plaintiffs' Exhibit 1Q which is an application for Farmers Home Administration services. This document is dated March 30, 1961, just 13 days after the agreement between the parties. On page 2 of this application Talbots were required to list the major changes and improvements in farm crops and livestock intended by them and listed therein is "Install sprinkling system in spring of 1964." Obviously Talbots did rely on Shrives' misrepresentations and fully intended to take advantage of the sprinkling system Shrives represented was possible and feasible.

■■ Counsel for Shrives most seriously urges lack of sufficient proof of Talbots of another essential element of fraud, i. e., pecuniary damage, reliance being placed primarily on finding of fact VI of the trial court, i. e.:

"That values placed on the respective properties were reasonable values."

Shriveses argue, this means the values of the properties were $20,000.00 and $40,000.00 respectively, and since the property received by the Talbots was reasonably worth the purchase price paid, Talbots have failed in this essential element of the required

proof and thus are not entitled to judgment. If Talbots had sought or received a judgment for money damages for the alleged fraud, then this contention of the Shriveses would be correct under existing Idaho case law, for this court has long been committed to the rule that in order to show damage from fraud the purchaser of property must show that the property he obtained was of less value than the price paid for it. Smith v. Neeley, 39 Idaho 812, 818; 231 P. 105, 106. This principle was reiterated as late as 1964, in Andrus v. Irick, 87 Idaho 471, 394 P.2d 304. Thus where the purchaser seeks damages for alleged fraud it appears Idaho is committed to the "out-of-pocket" rule which limits the recovery of damages to the difference between the real value of the property purchased and the price paid or contracted for. This court has often recognized the existence of a different measure of damages referred to as the "benefit-of-bargain" rule, under which the damages allowed are the difference between the real value of the property purchased and the value which it would have had had the representations been true.

■ However, it is well to bear in mind that in the second trial of this case Talbots abandoned any cause of action they may have had for the various damages alleged and relied entirely and solely on their right to rescission; and this is the judgment granted by the trial court. In finding of fact XVI the trial court specifically found:

"That the north 300 acres was the bulk of the land in the sale for the raising of crops and the misrepresentations materially affected the use and value of this land."

This finding of fact by the trial court is amply supported by the record.

We have diligently researched all Idaho cases which have dealt with the application of the "out-of-pocket" rule in fraud cases and in none of them has this rule been applied to an instance where a defrauded purchaser has merely sought *rescission* rather than *monetary damages*. It is true

that this court in Bancroft v. Smith, 80 Idaho 63, at page 68, 323 P.2d 879, at page 881 stated that the out-of-pocket rule would apply to rescission as well as to a purchaser seeking damages. The exact language used is as follows:

"Assume the case of a defrauded purchaser who elects to rescind and forego damages. He must prove by clear and convincing evidence that the property is worth less than the purchase price. But, the amount of his damage is unimportant provided it is sufficiently substantial to warrant rescission."

Thus this is pure dicta and cannot be relied upon as binding precedent upon the court.

Additionally this court, in Weitzel v. Jukich, 73 Idaho 301, 251 P.2d 542, in a four-member majority opinion written by Justice Porter, pointed out the two rules for measure of damages in appropriate cases of fraud, i. e., out-of-pocket rule and the benefit-of-bargain rule but specifically held that these rules are not exclusive and should only be used when appropriate under the facts. The court further observed:

"The underlying principle is that the victim of fraud is entitled to compensation for every wrong which is the natural and proximate result of the fraud. The measure of damages which should be adopted under the facts of a case is the one which will effect such result."

■ Applying this principle to the facts at hand, where the purchasers (Talbots) have proved the value or worth of the property purchased to be materially and considerably less than it would have been had the representations made by Shrives been true instead of false, the purchasers are entitled to rescind the agreement even though the property received was in fact worth the purchase price.

By analogy this conclusion is supported by the cases collected in the annotation in 106 A.L.R., beginning page 141, cited for the proposition that:

"The rule supported by sound principle, as well as by the great majority of the cases, is that a purchaser's right to rescind, upon the ground of misrepresentation or mutual mistake concerning the character or condition of the property sold, or suitability for a particular purpose (or, as concerns real estate, its location), is not, as a general principle of law, defeated by the absence of pecuniary damage."

Nance v. McClellan, 126 Tex. 580, 89 S. W.2d 774, 106 A.L.R. 117 (1936); 23 Am. Jur., Fraud & Deceit, § 173, pp. 987–990; Mott v. Tri-Continental Fin. Corp., 330 F.2d 468, 470 (2d Cir.N.Y.1964); Boring v. Jungers, 22 Md. 458, 160 A.2d 780, 784–785 (1960); Turner v. Turner, 167 Cal. App.2d 636, 334 P.2d 1011, 1015 (1959). See Brooks v. Jensen, 75 Idaho 201, 270 P.2d 425. The right of a purchaser to rescind a real estate contract on the grounds of breach of an implied warranty that the property would be fit for the use intended, i. e., inhabitation, has recently been recognized by this court in Bethlahmy v. Bechtel, 91 Idaho 55, 415 P.2d 698.

There appears therefore to be no merit to the various objections raised by the Shriveses in their first assignment of error.

■ In their second assignment of error the Shriveses contend rescission should have been denied because of laches on the part of Talbots. This issue was not raised in the trial court, either in the first trial or in the second trial, nor was it raised on the first appeal or in the petition for a rehearing from the decision of the first appeal. It will not now be considered by this court, having been raised for the first time on the second appeal. Cantlin v. Carter, 88 Idaho 179, 397 P.2d 761; Robinson v. Spicer, 86 Idaho 138, 383 P.2d 844; Frost v. Mead, 86 Idaho 155, 383 P.2d 834; Cox v. Cox, 84 Idaho 513, 373 P.2d 929; Swaringen v. Swanstrom, 67 Idaho 245, 175 P.2d 692.

Finally the judgment on retrial is alleged erroneous in that:

(a) It collaterally reversed the amended decree of foreclosure entered Octoer 29, 1963 and set aside the sheriff's sale there-

under although Talbots requested, and have never appealed from, that decree which thereby became final.

■ This same argument was indirectly raised without success on both the first appeal in this case and the petition for rehearing which was denied. The issue it presents is patently without merit. Talbots correctly appealed from the judgment of foreclosure upon which the decree and order of sale were based. Where that judgment is subsequently reversed after execution and sale of the property, Shriveses become obligated to make restitution of all things received by virtue of that judgment. Here where there was no third party to the judicial sale and where respondents by their complaint sought rescission of the land sale agreement the district court correctly and equitably cancelled the deed of the Weston property running to Talbots and indirectly set aside the sheriff's sale thus to place the parties in the positions which they occupied prior to the fraudulent transaction. 5 Am.Jur.2d, Appeal & Error, § 1004, p. 429. See Eagle Rock Corp. v. Idamont Hotel Co., 60 Idaho 639, 95 P.2d 838. Talbots' requested amendments to the decree and order of sale cannot be considered a ratification of the court's judgment. The execution upon and the sale of the property could not be stayed though the judgment of foreclosure had been appealed except by respondents' filing a supersedeas bond in accord with the statutory authorization provided in I.C. § 13–207. See Eagle Rock Corp. v. Idamont Hotel Co., supra; Mays v. Winstead, 59 Idaho 677, 86 P.2d 471. Respondents had no reason to stay the sale of the property since their purpose was not to keep possession of the property but correctly took precaution to see that the sale was conducted according to law.

(b) It is confusing, contradictory and incomplete in ordering appellants to repay the $11,278.97 down payment, yet rescinding the deed to such property and leaving undetermined the amount paid by appellants on the Clifton mortgage and to whom that amount be paid.

■ This assignment is wholly without merit for in the first instance it is based upon an obvious misreading of the judgment. The court ordered cancellation of the deed to the Clifton property only in event the Shriveses choose to return the down-payment property to Talbots rather than pay Talbots the $11,278.97 which represented Talbots' equity in that property when transferred. If the former alternative were chosen and the property returned, Shriveses would receive restitution in recompense for moneys they had paid on the outstanding mortgage on the property. Through proper construction the rights and liabilities of the respective parties are made clear and the judgment cannot be assailed upon the ground of uncertainty. Though the district court did not compute the amount paid by Shriveses on the mortgage debt, this amount can be definitely ascertained. The judgment is not invalid for indefiniteness or uncertainty; the parties may readily understand their rights and liabilities thereunder. Sinnett v. Werelus, 83 Idaho 514, 365 P.2d 952; Irvine v. Mazurette, 115 Cal.App.2d 612, 252 P.2d 362 (1953); Niles v. Louis H. Rapoport & Sons, 128 P.2d 50 (Cal.App.1942). See also 49 C.J.S. Judgments § 72, p. 191.

Judgment for Talbots (respondents) affirmed with costs on this appeal.

McQUADE and TAYLOR, JJ., concur.

McFADDEN, Chief Justice (dissenting).

On retrial of this cause following remittitur from this court, the only issue involving any misrepresentation was the following allegation by the Talbots in their counterclaim:

"That Plaintiffs had raised, and Defendants could raise, fall wheat on 120 acres of that land on the hillside then owned by Plaintiffs or that the 120 acres could be watered by means of a sprinkling system which could be put in the spring and drain under the hill, and any crop could be raised thereon."

348

All other allegations of false and fraudulent statements were disposed of on the first appeal adversely to the Talbots.

On the second trial, the parties stipulated that the record of the first trial was adopted by the parties, and that the proceedings on the second trial were to be for the purpose of supplementing the previous record to the extent required under the remittitur from the supreme court. Thus, on the second trial, the trial court considered the evidence submitted initially, and also that produced at the second trial.

It is to be pointed out that the only evidence presented on the first trial pertaining to the issue of false and fraudulent statements allegedly made by Mr. Shrives, and considered by the court on the second trial, consisted of the following statements: Direct examination of Mrs. Talbot:

"Q. Then, tell us what occurred with respect to the dry farm then?

"A. Well, we drove up past the dry farm and he was showing us the acreage there, and there's a spring there and there's a drain there.

"Q. On the dry farm?

"A. On the dry farm. And he said the spring was his and that it would—he said, 'We put the drain in ourselves. That's ours.' And then we went up on top of the hill and looked at the dry part up there. And it was early in the Spring, too wet to get out onto the ground, and I said to Mr. Shrives, 'What has been or what can be raised on this land?'

"Q. That's on this dry farm.

"A. On the dry farm. Up on top of the hill.

"Q. Yes.

"A. Mr. Shrives said, 'You can raise good Fall wheat here.' Then he went on to say that if we would put a sprinkling system into that—

"Q. Spring?

"A. —spring and the drain that all of the land could be watered and we could raise any kind of crops we wanted.

"Q. Now, did you look over the spring during this trip up to this part of the land?

"A. My husband and Mr. Shrives walked up along the canal bank to see it.

"Q. And you remained in the car.

"A. I remained in the car.

* * * *

"Q. Then have you told us everything you can recall as having occurred up there on the so-called dry farm land at this time?

"A. I think so."

On cross-examination, Mrs. Talbot testified:

"Q. You went up on top of the hill first. Is that right?

"A. Well, we drove along the road just slowly, talked of the property as we went.

"Q. Did you get out on the top of the hill?

"A. I don't recall that we did.

"Q. You could have done if you'd wanted to?

"A. Yes, we could have done, but it was muddy.

"Q. Now, what kind of vegetation was there on that property on top of the hill?

"A. I couldn't tell. There was stocks [sic: stalks] of something coming up and I couldn't tell just what they were; and that's why I asked Mr. Shrives, 'What has been or what could be raised here?'

"Q. Now was your question that way, Mrs. Talbot, 'What has been or what could be raised here'?

"A. Yes, that's the words I asked him.

"Q. And you did see some stocks [sic] actually coming through?

"A. There was stocks [sic] of something, but I couldn't tell just what it was.

"Q. In other words, there was no snow on the ground? There was noth-

ing to obscure your seeing what was there?

"A. As I recall, I don't think there was any snow.

"Q. Did you look across the road, Mrs. Talbot to west?

"A. I don't remember.

"Q. You don't know what kind of crops were being grown immediately across the road?

"A. I think there was hay across the other side.

"Q. And it's on the same level with this, isn't it?

"A. Yes, sir.

"Q. It's the same kind of ground, and the only thing that's different is that the road runs between them. Isn't that so?

"A. Yes sir.

\*    \*    \*    \*    \*    \*

"Q. And he told you that his father and Mr. Thompson had put the drain in, did he not?

"A. He never mentioned Mr. Thompson. He says, 'We put the drain in.' "

On cross-examination under the rule, Mr. Shrives testified:

"Q. Now as you drove up to this property [i. e., the 300 acre tract] did you show Mr. Talbot a spring?

"A. Well, as we drove up on top of the sand hill you can't help but see the drain and the spring off to the right.

"Q. Was there a conversation concerning the spring and drain—

"A. I think the only—

"Q. —at this time.

"A. I think the only conversation, as I recall, was that the drain drained through and emptied down into the West Cache Canal.

"Q. Did you at any time during this particular day and your conversations with Mr. Talbot on this day tell Mr. Talbot that the spring was available for a sprinkler system to irrigate the three hundred acres on top of the bench.

"A. Well, in the first place there isn't no three hundred acres on top of the bench.

"Q. Well, what is there?

"A. There's a hundred and twenty acres on top of the bench.

"Q. And then the other hundred and twenty—the other hundred and eighty is below that?

"A. The other hundred and eighty is level with the spring or below it.

\*    \*    \*    \*    \*    \*

"Q. Now, did you tell Mr. Talbot anything with reference to the irrigation of any of this land, the hundred and eighty or the hundred and twenty from this spring?

"A. In regard to the spring, no.

\*    \*    \*    \*    \*    \*

"Q. Now, Mr. Talbot, [sic] I'll ask you if you know of your knowledge whether or not any part of the three hundred acres could be irrigated or watered from the spring or other source?

\*    \*    \*    \*    \*    \*

"A. To the best of my knowledge, it never has been. Now, whether it can be, that is something I am not—I'm not able to say. I do not know."

Mr. Shrives, testifying on his own behalf, on direct examination stated:

"Q. Did you ever make any statements to Mr. or Mrs. Talbot to the effect that they could raise good Fall wheat on the hundred and twenty acres up on the bench?

"A. Yes, I recall the question was asked to me when we were up there, had we—had we ever raised wheat up on top of that bench, to which the answer was yes."

After Mr. Shrives testified in his own behalf, on cross-examination he stated:

"Q.—Well now, Mr. Shrives, on the property on the bench, the hundred and twenty acres, which I understood under your direct testimony you did say to the Talbots had raised wheat?

"A. That is right.

"Q. You deny saying that it could raise good Fall wheat or did raise good Fall wheat. You simply say that you said it did raise wheat or had raised wheat.

"A. I was asked if it had ever raised wheat, to which I replied yes.

"Q. And that's all that was said?

"A. To the best of my knowledge— no, I will take it back. They asked if we'd ever done any grazing up there, and I said, 'We had grazed in the Spring because of the wet moisture and we get quite a lot of June grass.'

"Q. Now, to your knowledge has there been any wheat raised there in the last five or six years during the occupancy of the land by Mr. Benson?

"A. Well, I'm not—I don't think I'm qualified to answer because I'm not sure.

"Q. I see. Did you make any statements concerning the use of the spring and the drain for a sprinkler system to the Talbots?

"A. Did you say spring and drain?

"Q. Well, either one or both.

"A. To the spring, no.

"Q. To the drain, what?

"A. To the drain, Mr. Talbot asked me if it was feasible that a person could take water out of the drain and use a sprinkling system; to which I answered, 'To the best of my knowledge, it could be done.'

\* \* \* \* \* \*

"Q. And I take it then at no time did you tell Mr. Talbot that the place upon the bench or the upper area could raise good crops, the whole three hundred acres, if you put in a sprinkling system in the drain—or if he put in a sprinkling system in the drain.

"A. Would you repeat that?

"Q. Well, I say, I take it then that at no time did you tell Mr. Talbot insofar as the place up there above, the three hundred acres up there, did you tell Mr. Talbot that if a sprinkler system was placed in the drain that the acreage up

there would raise good crops, the whole of it?

"A. Not the whole three hundred, no, sir.

"Q. Well, did you tell him that any part of it would raise good crops if this were done?

"A. No sir, I did not, because I would not be aware of what the sprinkler would do."

Mr. Talbot testified on direct examination:

"A. My wife asked him what could be raised upon that hundred and twenty acres, and he said 'Good Fall Wheat.' And as we went down over the bench like he says, 'That drain is his and it can be—

"Q. Now, just what drain are you talking about?

"A. I'm talking about the drain that goes from Thompsons through his—my field—or his field.

\* \* \* \* \* \*

"Q. Mr. Talbot, at the time that these two matters, that is, the spring and drain were pointed out by Mr. Shrives, was there any conversation at all?

"A. Yes, he said it could be stopped and a sprinkling system—

"Q. Now wait just a minute. He says —Mr. Shrives

"A. Yes.

"Q. —says—

"A. Yes.

"Q. What could be stopped?

"A. The drain could be stopped off and a sprinkling system be put in there and you could sprinkle the whole thing.

"Q. What whole thing?

"A. The whole farm.

"Q. Well, not the forty acres down below.

"A. No, up above."

On the basis of this testimony, following the first trial, the trial court found:

"That the plaintiffs did not make any misrepresentations as to the condition

of the home, the premises, the history of the crops, the water or rights of way; that defendants were aware that plaintiff had not occupied or operated the premises for several years prior to the sale."

And on the basis of such findings, the trial court concluded:

"Defendants have failed to establish the allegations of their Counter Claim and are not entitled to any recovery or relief thereon."

At the subsequent trial, the only additional testimony submitted on the issue then before the court is as follows:

Mr. Talbot on cross-examination admitted that he had never had a study made as to the feasibility of irrigating the upper 120 acres from the drain ditch. He also testified that he knew that the upper 120 acres had not been irrigated. He stated that at the time of his inspection of the property before execution of the agreements he knew the actual number of acres irrigated on the entire farm was only forty acres. He stated:

"Q. So that the discussions about irrigating the plateau, the bench land, and the other lands were future possibilities?

"A. He says it could be.

"Q. There were future possibilities, weren't they, sir?

"A. Well, he says that's what could be. He says that you could do it. If he said you could do it, I guess that would be up to the future."

On redirect examination Mr. Talbot testified:

"Q. Mr. Talbot, you were asked by counsel whether or not you ever put a dam in the drain, and whether or not you ever sprinkled from the drain; and you answered no to each of those questions. Would you explain to the court and counsel what if anything you did after you were on this place with respect to investigating and determining the fact as to damming the drain and as to sprinkling or irrigating from the water created by a dam in the drain?

*    *    *    *    *    *

"A. Well, most of that land—a lot of that land is alkali and it's wet, and I couldn't see any use of putting a dam in there, and then up on that hill it's so sandy that what's the use of putting it up there. It would just dry out."

Mr. Shrives on cross-examination was asked:

"Q. Now you do admit at this time, do you, Mr. Shrives that when you had these conversations with Lavon Talbot in March of 1961 that you did consider this question about the drain and sprinkler system, how it could be installed, and you thought it could be feasibly sprinkled on the upper hundred and twenty acres?

"A. I did not consider the possibility of how it could be installed or anything else.

"Q. But you thought it would be a feasible arrangement?

"A. I was only asked the question if I thought it was feasible to sprinkle out of the drain; to which I answered to the best of my knowledge yes. How it would be done or what he was going to do or where he was going to use it, I had no idea, or did he say so.

"Q. And at that time you had no background in sprinkling systems had you?

"A. No.

"Q. And you weren't aware of the amount of water it would take or to water certain crops of that whole hundred and twenty acres? Were you aware of that?

"A. There was no discussion of the hundred and twenty acres. There was no discussion as to any acreage."

After the second trial, the trial court found that Mr. Shrives made the following representation to the Talbots:

"XII.

*    *    *    *    *    *

" * * * referring to the upper 120 acres of bench land located on said tract and the spring and drain located below

said bench land on the remaining 180 acres * * *

"(a) That water could be removed from the drain extending from the original Thompson property and extending through the Shrives' property and emptying into the West Cache Canal;

"(b) That the drain was his;

"(c) That this water in the drain could be pumped upon the bench land and crops could be grown thereon;

"(d) That it would be feasible to install a sprinkler system in said drain and pump water to the bench lands for crops, and that any crops could be raised thereon;

"(e) That fall wheat had been grown on the bench land and that they could raise fall wheat on that ground."

The trial court further found:

"XIII.

"That the above representations by Plaintiff were material and untrue or half true because:

"(a) That at the time of making said misrepresentations there was an agreement on record between Washington J. Thompson and his wife and Frank Shrives, Sr., and his wife, the owners of the property when the drain was dug and placed into effect, a copy of which at trial was marked as a joint exhibit and incorporated herein by reference thereto; this agreement provides for the joint construction, use, maintenance and costs of maintenance of the drain and for a right of way of 20 feet on each side of the center of the drain.

"(b) That the drain if dammed up near the boundary of the Thompson-Shrives' property will make the Thompson and adjoining property too wet for farming purposes and would defeat the purpose of the drain. The soil type of the Shrives property and the Thompson property in the vicinity of the drain are generally the same and the damming of the drain for the purpose of installment of a

sprinkler system would adversely affect the adjacent property.

"(c) That the flow of the water in the drain fluctuates between 25 to 50 inches, depending upon the time of year and the effect of irrigation on the lands adjacent thereto comprising the water table which feeds the drain.

"(d) That the optimum use of this size stream and on the sandy loam on the 120 acres of bench land would not be over 40 acres.

"(e) That to place water on the bench land from the drain would require a lift from a pump of at least ninety feet because of the difference in elevations between the land and the drain, plus a piping of 500 to 600 or more feet to get to the boundary of the sandy loam, plus an additional main line in the land to be irrigated.

"(f) That to install such a sprinkler system, considering the expense involved and the supply of water, would at the very best produce only a marginal result, and would, in fact, not be a feasible operation for that area.

"(g) That no crop has been successfully raised on the bench land since at least 1955.

"XIV.

"That the said plaintiff was ignorant of the truth of said representations and intended that Defendants should act upon the same.

"XV.

"That the Defendant relied upon the misrepresentations made by the Plaintiff and acted thereon by purchasing said property in ignorance of their falsity."

Among the conclusions of law, the trial court stated:

"The waters in the drain were not available for use by Defendants as represented to them by Plaintiff, Frank Shrives, Jr.

* * * * * *

"A single material false representation is sufficient to warrant relief on

the theory of fraud, and the misrepresentations by Plaintiff Frank Shrives, Jr., concerning his ownership of the drain, the use thereof and the raising of crops on the north 300 acres, and the consequences of these misrepresentations meet all of the essential elements of actionable fraud by clear and convincing evidence."

The trial court found five separate representations were made, and then in the next finding found these representations were material and untrue or half true. It cannot be determined which of the representations, if any, were wholly untrue and which of them, if any, were only half true. With such uncertainty, in view of the specific findings of fact initially made following the first trial by the court, how can it be said the elements of fraud were proven by clear and convincing evidence. See: Mountain Electric Company v. Swartz, 87 Idaho 403, 393 P.2d 724; Janinda v. Lanning, 87 Idaho 91, 390 P.2d 826; Thomson v. Marks, 86 Idaho 166, 384 P.2d 69; Walker v. Nunnenkamp, 84 Idaho 485, 373 P.2d 559.

The trial court's Finding XIII, subparagraph (a) to the effect there was a written recorded agreement concerning the drain, must have reference to Finding XII(b) that the drain was Shrives'. Assuming that the record would sustain the Finding XII(b), the Talbots examined this drain, and could see that it was an extension of a drain coming from the adjoining landowner's property. To base a judgment of rescission in this case on such a state of facts is unrealistic in view of the issues presented for resolution on the second trial. See: Suchan v. Rutherford, 90 Idaho 288, 410 P.2d 434.

The trial court's Finding XIII, subparagraph (b), supra, is not responsive to the issue before the court on the second trial. No one testified that Shrives claimed the water in the drain should be dammed near the boundary of the Thompson-Shrives property. The record and exhibits admitted into evidence reflect there had been several dams previously placed in the ditch. The dam referred to by the trial court in this finding was near the west boundary of the property, near the county road, and would only have collected water discharging from the adjoining property to the west. The flow in the drain was to the east. Further down the drain and on Shrives' property there were two separate springs discharging their waters into the drain. Testimony of several witnesses was to the effect that the proper place for any dam for irrigating purposes would be some 2500 feet to the east of the dam referred to by the trial court.

Findings of Fact XIII, subparagraphs (c), (d), (e), and (f), supra, deal with the availability of water for irrigation, the use of this water, and the costs of irrigating by pumping and sprinkler system, and must be considered as dealing with whether the trial court's Finding XII(b), (c) and (d), supra, were true or half true. Considering the testimony adduced at both trials, it is safe to state that the statements attributed to Mr. Shrives dealt only with his opinion as to what could be done. Mr. Talbot on cross-examination admitted that the discussions he had with Mr. Shrives were future possibilities only. In order to establish misrepresentation of a fact as a basis for actionable fraud generally it is essential that the fact claimed to be misrepresented have reference to an existing fact, and not future prediction, possibility or opinion. Am. Law.Inst., Restatement, Torts, Vol. 3 § 525, comment d; 23 Am.Jur. p. 781, Fraud and Deceit, §§ 27, 28. This court in Weitzel v. Jukich, 73 Idaho 301, 251 P.2d 542, stated:

"Elements of fraud generally consist of a representation or statement of a *past* or *existing* fact which is material, which is untrue; the speaker's knowledge of its falsity or ignorance of its truth; his intention that it should be acted on by the person to whom it is made; ignorance of its falsity on the part of the person to whom it is made and reliance on the representation; his right to rely upon it; his damage occa-

**354**

sioned thereby. * * *." (Emphasis added) 73 Idaho 304, 251 P.2d 543

See also Walker v. Nunnenkamp, 84 Idaho 485, 373 P.2d 559. The statements attributed to Mr. Shrives did not have reference to promises made without intention of performing, as was the case of Cooper v. Wesco Builders, Inc., 73 Idaho 383, 253 P.2d 226. In Barron v. Koenig, 80 Idaho 28, 39, 324 P.2d 388, it is stated:

"A representation which is an honest expression of opinion, based upon reasonable ground, and which is expressed and understood as nothing more than an opinion, cannot be made the basis of actionable fraud. Johnson v. Holderman, 30 Idaho 691, 167 P. 1030; Smith v. Johnson, 47 Idaho 468, 276 P. 320; Nelson v. Hoff, 70 Idaho 354, 218 P.2d 345; 37 C.J.S. Fraud § 57, p. 334. Misrepresentations as to future income and profits are usually held to be non-actionable expressions of opinion. 37 C.J.S. Fraud § 54, p. 320."

It is my conclusion that these findings ignore the statement of Mr. Talbot himself, who recognized Mr. Shrives' statement as being future possibilities. Again this claim of fraudulent misrepresentation is not sustained by clear and convincing evidence.

Finding of Fact XIII subparagraph (g) states, "That no crop has been successfully raised on the bench land since at least 1955." On the basis of that the trial court determined that its previous Finding XII(e), that Mr. Shrives had represented, "That fall wheat had been grown on the bench land and that they could raise fall wheat on that ground," was either untrue or only half true. The record reflects without dispute that even though no crop had been grown since 1955, crops had been grown and raised on the property prior to that time. The court's statement is a paralogism, or a pseudosyllogism, in which the conclusion does not follow from the premises, i. e., that because no crops had been grown since 1955 Mr. Shrives' statement was untrue or half true.

It is my conclusion that the judgment or rescission entered by the trial court should be reversed and judgment entered in favor of Mr. and Mrs. Shrives.

SMITH, J., concurs in this dissent.